# GERTGENS *v.* O'CONNOR.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 65.   Argued November 9, 10, 1903.—Decided November 30, 1903.

The decision of the land department in a contest case is conclusive in the courts upon all questions of fact.

A patent is a conveyance by the government of the title, and is conclusive in the hands of the patentee as against every individual unable to show a superior right, legal or equitable.

The act of March 3, 1887, 24 Stat. 556, is remedial in its nature and, in addition to directing an adjustment with railroad companies of their land grants, provided for securing the equitable rights of parties contracting with the companies, and also those of settlers upon lands within the limits of the grants.

The term *"bona fide* purchaser" found in the act is not used in its technical sense, but only as requiring good faith in the transactions between the railroad companies and parties contracting with them in respect to the lands.

One who for a sufficient consideration has obtained an option from a railroad company, giving him the right to purchase within a specified time a large tract of land, and in reliance upon that option has expended money and labor in securing settlers, may be regarded as a *"bona fide* purchaser" within the scope of the act and entitled to the preferential right of purchase given by section 5.

While a settler is favored in law, the equities of others must also be considered; and where he places his improvements upon land with full notice of the superior rights of others thereto, he is not entitled to be regarded as a *bona fide* settler either within the letter of the statute or within the reach of any reasonable equities.

THIS was an action in ejectment commenced on February 15, 1900, by John P. O'Connor against Jacob Gertgens, in the District Court of the Sixteenth Judicial District of the State of Minnesota, to recover possession of the southwest ¼ of section 9, township 125, range 45 west. The defendant appeared and answered. A trial was had before the court without a jury, resulting in a judgment for the plaintiff, which was, on April 4, 1902, affirmed by the Supreme Court of the State, 85 Minnesota, 481, and thereupon this writ of error was sued out.

The facts are these: The tract was surveyed public land, situate in the county of Traverse, and lying within the twenty-mile indemnity limits of the grant to the St. Paul, Minneapolis and Manitoba Railway Company, as defined by acts of Congress dated respectively March 3, 1857, 11 Stat. 195, c. 99, and March 3, 1865, 13 Stat. 526, c. 105. It, with other lands, was withdrawn from settlement and entry under the land laws of the United States by executive withdrawal, dated May 25, 1869. In April, 1885, the tract, being within the indemnity limits, was, with other tracts, selected by the railway company as indemnity for deficiencies claimed to exist within the place limits. There selections were all finally cancelled on October 23, 1896.

Prior to April 15, 1891, the land was unoccupied, but at that time the defendant, being fully qualified as a homestead claimant, took possession with a view of claiming it as a homestead under the laws of the United States, has ever since occupied it as his homestead and made improvements thereon of the value of $1,200. He made application at the local land office for a homestead entry but it was refused by the local land officials, and such refusal sustained on appeal by the Commissioner of the General Land Office. The refusal was on the ground that the land was within the twenty-mile indemnity limits of the railway company, and had been selected by the company in 1885, long before the defendant went upon the land.

In July, 1880, the railway company entered into a written agreement with the Rev. John Ireland, a citizen of the United States, by which the company gave him the sole and exclusive right and authority to place settlers upon and sell to them all the lands in the counties of Big Stone and Traverse, to which the railway company might be entitled by virtue of the land grants of March 3, 1857, and March 3, 1865, and which were included within the indemnity limits of said grants. This contract expired December 31, 1881. On March 30, 1883, the railway company made a new agreement, which, after referring to the prior contract, contained this stipulation:

"Now, therefore, the contract herein referred to having expired on the 31st day of December, A. D. 1881, and the R. R. Co. not yet having acquired title to the lands in question, it is now agreed between the R. R. Co. and the Rev. John Ireland that when title to these lands are acquired by the R. R. Co., and notice of the same is given to Rev. John Ireland, he shall have the privilege and the right at any time within sixty days of date of said notice of purchasing for himself or such parties as he may designate, due regard being had, as stated in supplement to said contract for settlers who may have obtained any claim upon such lands previous to the date of said contract, any or all of the lands included in said contract, not to exceed the amount of 50,000 acres at uniform price of four dollars per acre, ten per centum of all receipts from said lands at the above price to be furthermore paid to the said Rev. John Ireland according as the monies are received by the company, when such lands shall be purchased by Rev. John Ireland or those whom he may designate, the conditions of sale usual with the company shall be observed or at least the interest upon the purchase money shall be paid from the date of purchase to the fifteenth day of December following, when the usual condition shall be enforced."

This agreement was duly recorded in the office of the register of deeds of Traverse County, Minnesota. On February 8, 1896, Ireland made application to the Land Department for leave to purchase from the government the land in controversy under the provisions of the fifth section of the act of Congress of March 3, 1887, 24 Stat. 556, c. 376. This application was contested by the defendant, but the claim of Ireland was sustained by all the officials of the Land Department, from the local officers up to the Secretary of the Interior. A patent was thereupon issued to Ireland, from whom the plaintiff obtained a conveyance. The act of March 3, 1887, was an act directing the Secretary of the Interior to adjust, in accordance with the decisions of the Supreme Court,

the several railroad land grants made by Congress.  Section 5, under which Ireland made his claim, is copied in the margin.[1]

*Mr. S. M. Stockolager* and *Mr. Thomas Kneeland* for plaintiff in error.  *Mr. George C. Heard* and *Mr. F. W. Murphy* were on the brief.

*Mr. Edward T. Young* and *Mr. H. F. Stevens* for defendant in error.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

The patent was issued to Ireland after a contest between him and the defendant, in which the several officials of the Land Department, from the local officers to the Secretary of the Interior, sustained his contention.  The decisions of the Land Department in such contest cases are conclusive upon all questions of fact.  *Burfenning* v. *Chicago &c. Railway,* 163 U. S. 321, 323, and cases cited; *Johnson* v. *Drew,* 171 U. S. 93, 99; *Gardner* v. *Bonestell,* 180 U. S. 362; *De Cambra* v. *Rogers,* 189 U. S. 119.  The patent passed the legal title to Ireland.

---

[1] SEC. 5. That where any said company shall have sold to citizens of the United States, or to persons who have declared their intention to become such citizens, as a part of its grant, lands not conveyed to or for the use of such company, said lands being the numbered sections prescribed in the grant, and being coterminous with the constructed parts of said road, and where the lands so sold are for any reason excepted from the operation of the grant to said company, it shall be lawful for the *bona fide* purchaser thereof from said company to make payment to the United States for said lands at the ordinary government price for like lands, and thereupon patents shall issue therefor to the said *bona fide* purchaser, his heirs or assigns: *Provided,* That all lands shall be excepted from the provisions of this section which at the date of such sales were in the *bona fide* occupation of adverse claimants under the preëmption or homestead laws of the United States, and whose claims and occupation have not since been voluntarily abandoned, as to which excepted lands the said preëmption and homestead claimants shall be permitted to perfect their proofs and entries and receive patents therefor: *Provided further,* That this section shall not apply to lands settled upon subsequent to the first day of December, eighteen hundred and eighty-two, by persons claiming to enter the same under the settlement laws of the United States, as to which lands the parties claiming the same as aforesaid shall be entitled to prove up and enter as in other like cases.

It devolved upon the defendant, contesting that title, to show a superior right, legal or equitable, to the land. Both the trial and Supreme Courts of the State decided against the defendant's claim. We have thus the unanimous conclusions of all the officers of the Land Department of the United States and of the judges of the courts of the State, to whom the question could be presented, in favor of plaintiff's title.

In respect to certain requirements of section 5, under which the Land Department acted there is no question. Ireland was a citizen of the United States. The tract was within the contract made by the company with him in 1883. It had never been conveyed to the company, or for its use. It was an odd-numbered section, within the limits of the grant, and coterminous with a constructed part of the road. It was excepted from the operation of the grant because of a defect in the selection of indemnity lands. All these matters being beyond dispute, there remain open the question whether the land could be deemed to have been sold by the company to Ireland, and whether he was a *bona fide* purchaser; and, further, conceding that Ireland comes within the provisions of the section, whether the equitable rights of the defendant as a homestead settler are superior.

Was there a sale, and was Ireland a *bona fide* purchaser within the scope of said section? It is contended on the one hand that these are questions of fact concluded by the decisions of the Land Department, and on the other that it is the duty of the court to construe a written instrument, and as the agreement between the company and Ireland was in writing it is a question of law and not of fact whether there was a sale by the company and a purchase by Ireland. Doubtless, whether a transaction evidenced by a written agreement was a real transaction or a sham, whether it was executed with a fraudulent intent or in good faith, may present questions of fact, and in so far as those questions are involved in this case the conclusions of the Land Department are final. We must accept the agreement between the company and Ireland as

genuine, made in good faith, and supported, so far as it can be, by all outside facts, such as a sufficient consideration.

It is, however, earnestly contended that there was no sale or purchase; that the company gave only a mere option, which, though binding on it, cast no obligations on Ireland. If he wanted to complete the contract and pay for the land, he might do so. If he did not, he was under no liability to the company. Strictly speaking, this contention is correct. Ireland had made no payment for this land, had made no absolute promise to pay, and it was optional with him whether he took the land or not. And if it be a condition of acquiring a right under this section, that the party claiming must either have paid or promised to pay, then Ireland was not entitled to any benefit therefrom. But we think the section does not compel such construction. We have more than once held that the entire statute was remedial in its nature and must be construed so as to carry out the intent of Congress and secure to the parties the intended relief. Primarily, the purpose was to secure an adjustment of the various land grants in aid of railroads. Much confusion had existed in the construction and administration of those grants. There had been conflicting decisions, and Congress attempted, without displacing vested rights, to do equity to all parties claiming interests in lands within these various grants. It did not purpose to merely define legal rights or prescribe new methods for their enforcement. The courts were competent under the law, as it stood, without additional legislation to preserve such rights.

There were three parties whose interests and equities were to be regarded: First, the railway company, the beneficiary of the grant; second, parties who had dealt with the railway company in reference to lands claimed by it to be within the scope of its grant; and, third, parties who had attempted to secure title under the settlement laws of the United States. With reference to the railway company, it is sufficient to say that Congress aimed to limit its acquisition of title to the

amount of land which it had in fact earned by the construction of the road, and prescribed that the adjustment with it should be made in accordance with the rulings of this court; authorized actions to recover any lands improperly conveyed to the company, or, if the company had parted with them, the value thereof in money.

As to those who had dealt with the railway company, its evident purpose was to secure to them the lands they had contracted for, in so far as it could be done without trespassing on the rights of settlers. The scope of section 5 is disclosed by its opening words, "where any said company shall have sold." In case of a sale, certain privileges are given upon certain conditions. Nowhere does it provide as one of those conditions that the company shall have received full, or indeed any, payment. If there is a sale it is sufficient. Why in a remedial statute may not the word include a sale upon conditions, one in which the proposed buyer has an election to accept the company's promise? The section does not attempt to relieve any one whose transactions with the railway company were not in good faith. The term *"bona fide* purchaser" is used in the statute; but, as we pointed out in *United States* v. *Winona &c. Railroad,* 165 U. S. 463, 480, 481, not in any technical sense, but simply as demanding good faith in the transactions between the individual and the company. It is true that the parties who, in that case, had dealt with the company had in fact purchased and paid value, and it was unnecessary to consider anything more than the effect of such transactions. But still it was distinctly held that the term *"bona fide* purchaser" was not intended in any technical sense, but only as one implying good faith.

In reference to Ireland's actions under his contracts with the company, the Supreme Court of the State said (p. 488):

"Under his first contract with the railroad company, Ireland expended large sums of money and devoted a great deal of time to a colonization enterprise, and the expenditure and labor was kept up until 1883; large numbers of people being

thereby induced to settle in a new country tributary to the line of road belonging to the company.

"By it the company constituted Ireland its mere agent to make sales of the lands therein scheduled, to receive payment thereon, and to bind it to convey when its title should be perfected, or to return the money paid in case it failed to obtain title.

"The agreement of March 30 was wholly different. The agency was at an end. Ireland was given the right to purchase for himself and for others 50,000 acres at a stipulated price per acre, and upon certain terms. The company could not then convey, and when it could was uncertain, and it was agreed that purchasers should not be obliged to pay any part of the purchase price until it was within the power of the company to give good title. This was the construction placed upon the contract by the parties thereto, and it was the rational and proper one. Ireland proceeded under this contract, as he had under the first, to secure purchasers for these lands. They became actual residents, and received contracts for conveyances. He expended much time and large sums of money in the scheme to populate the country in question, and his success was very noticeable."

It is not pretended that what he did under these contracts, including therein his outlays of time and money, were under his last agreement to be accepted by the company as so much payment for the land, but these facts are stated to show the *bona fides* of the transaction; that it was not an attempt by means of a mere option to facilitate the acquisition of title from the government to the injury of *bona fide* settlers. On the contrary, Ireland was seeking to bring settlers on these lands, and thus aiding in carrying out the general purpose of the government to transform the vacant public lands into homes. Surely a purpose so in harmony with that of the government and an effort in the way that he pursued to carry that purpose into effect makes a case appealing to the favorable consideration of Congress, and is in its nature essentially

different from a pure speculation in public lands at the expense of *bona fide* settlers.   The rulings of the Land Department have been along the line of a recognition of the fact that attempts in good faith by a party to obtain from a railroad company for *bona fide* settlements lands believed to belong to it or expected to be acquired by it, present cases which were intended to be included within the act of 1887, and entitled to its protection.   *In re Campbell*, 12 L. D. 247; *Telford* v. *Keystone Lumber Co.*, 18 L. D. 176; 19 L. D. 141; *Holton* v. *Rutledge*, 20 L. D. 227; *Austin* v. *Luey*, 21 L. D. 507.

It must be borne in mind that the purpose of section 5 was not relief to the company, but to one dealing with it.   Ireland by his contract had obtained rights from the company even if he had not assumed obligations to it.   The land was the property of the government, and property to which the company acquired no title, but being within the limits of its grant it had claimed a right and contracted with Ireland as though it had or would receive the title.   Section 5 gave to Ireland only a right to purchase this land from the government—a preferential right—paying to the government its price, no portion of which was to pass to the railway company, and gave him that preferential right because of his dealings with the company.   He had sought to obtain title to this land from the company.   He had made a contract by which, if the company acquired title, he could obtain that title; and Congress, by section 5, simply provided that, having so acted in respect to this land, he should have a preferential right of purchase. The company neither gains nor loses.   The government receives its price for the land, and is, therefore, fully protected, and Ireland receives that, in respect to which he certainly has some equitable claim of consideration, a preferential right of purchase.

The third party is the settler under the land laws, and we pass to consider his status and rights.   A settler is, as has often been said, favored in law, but it does not follow therefrom that he is the only one whose equities are to be consid-

ered. Congress, by section 5, made provision for his pro-
tection—such provision as it deemed sufficient. While it
gave to purchasers from the railway company a preferential
right of purchase it excepted therefrom lands which at the
times of such purchase "were in the *bona fide* occupation of
adverse claimants under the preëmption or homestead laws
of the United States, and whose claims and occupation have
not since been voluntarily abandoned." In other words, it
said that no purchaser from the railway company should have
a preferential right of purchasing any lands which at the time
of his dealings with the railway company were in the hands of
a *bona fide* settler under the laws of the United States, unless
such settler should voluntarily abandon his settlement. As
between a purchaser from the railway company and a settler
on the lands, the settler was given the prior right. But the
defendant was not a settler at the time of Ireland's contract,
nor, indeed, until many years thereafter. Neither did he come
under the protection of the second proviso, for, although his
settlement was after December 1, 1882, it was not until long
after the passage of the act.

It is well to look further into his equities. It will be borne
in mind that he did not go upon the land until April, 1891.
The tract was within the indemnity limits of the company's
grant, and was, therefore, subject to selection. It had been
withdrawn from entry under the land laws, and that fact ap-
peared on the records of the local land office. It had, in fact,
been selected by the company, and that selection had not been
cancelled. Ireland's contract of 1883 was of record in the
office of the register of deeds of the county, and shown on
the books of the company. The defendant applied for leave
to enter the lands as a homestead, and was denied such leave
by the local land officers on the ground that it was within the
twenty-mile indemnity limits of the railway company's grant,
and had been selected by the company. He was charged with
knowledge of the act of Congress giving a preferential right of
purchase from the government in case the company's title

should in any way fail. Notwithstanding all·this, he remained upon the land and put his improvements on it, and now claims to be entitled to the rights of a *bona fide* settler. He does not come within the letter of the statute, nor does he come within the reach of any reasonable equities. He evidently took his chances on the possibility of the company's failing to obtain title and a subsequent failure of Ireland to insist upon his preferential right of purchase. He went upon the land with full knowledge of all the facts, which showed that he had no right to enter, speculating upon possibilities which have not been realized, and having so speculated he cannot complain if he suffer the consequences which often attend the failure of a speculation.

We think the judgment of the Supreme Court of Minnesota was right, and it is

*Affirmed.*