RUSSELL SAGE v. THEODORE A. MAXWELL and Others.

SAME v. HENRY MUNSTERMAN and Others.[1]

April 8, 1904.

Nos. 13,792—(220).

**Public Land Grant—Conflicting Titles.**

The subject-matter of these actions is land lying within the indemnity limits of the federal land grant to aid in the construction of the Hastings & Dakota Railroad. The plaintiff claims title to the land by virtue of such grant, and the defendants through patents therefor from the government. *Held,* construing the grant, that the company acquired no vested

[1] Reported in 99 N. W. 42.

right to the indemnity lands until the deficiency in the place lands was ascertained and a selection of lieu lands from the indemnity limits made and the selection approved by the Secretary of the Interior; and, further, that no such selection as to the land here in question was ever made until after the land was restored to the public domain, and the homestead rights of the occupants thereof attached.

Separate actions in the district court for Swift county by plaintiff, as assignee in trust of the Hastings & Dakota Railway Company, to have the legal title to certain quarter sections of land in possession of defendants adjudged to be held by them in trust for plaintiff, and to determine the adverse claims of defendants thereto. The cases involved the same issues and were tried together before Qvale, J., certain questions being submitted to a jury. From a judgment in favor of defendants in each case, plaintiff appealed. Affirmed.

*Owen Morris* and *Lyndon A. Smith,* for appellant.

*E. T. Young, C. W. Stanton,* and *Cohen, Atwater & Shaw,* for respondents.

START, C. J.

The above-entitled actions were heard and submitted together, the legal questions being practically the same in each. The subject-matter of the first case is the northeast $\frac{1}{4}$ of section 25, township 122, range 43, and of the second the northwest $\frac{1}{4}$ of section 7, township 121, range 42, all in Swift county, this state. Both quarter sections are within the indemnity limits of the federal grant in aid of the construction of the Hastings & Dakota Railway. In each case the defendants claim title to the land by virtue of the patents therefor from the United States. The plaintiff, as assignee of the Hastings & Dakota Railway Company, claims to be the equitable owner of the land, and brought these actions to have the legal title to the land held by the defendants respectively declared to be held in trust for him. The answers in each case put in issue the alleged equities of the plaintiff, and a trial in the district court resulted in a judgment in each case in favor of the defendants adjudging that the plaintiff was not entitled to any relief, and confirming the title of the respective defendants. The plaintiff appealed from the judgments to this court. The here material facts as stipulated by the parties and found by the trial court are substantially these:

On July 4, 1866, the Congress of the United States, by an act approved on that day (Act July 4, 1866, c. 168, 14 St. 87), granted to this state, to aid in the construction of a railroad from Hastings to the western boundary of the state, certain lands consisting of the odd-numbered sections within a belt ten miles in width on each side of the center line of the railroad when definitely located. It was also provided by such act that the Secretary of the Interior should cause to be selected from public unreserved land in the odd-numbered sections within twenty miles of such line so much land as should be equal to such land as had been sold or reserved by the United States, or to which pre-emption or homestead rights had attached prior to the location of such railroad, and, further, that upon the filing with the Secretary of the Interior a map of the location of the railroad it should be his duty to withdraw from market the lands embraced within the provisions of the act. On March 7, 1867, the state of Minnesota accepted this grant by an act of that date (Sp. Laws 1867, p. 11, c. 9), and thereby granted and vested the same in the Hastings & Dakota Railway Company, hereafter referred to as the "Company," by its then corporate name of the Hastings, Minnesota River & Red River of the North Railroad Company. The land in controversy in these actions is located within the indemnity limits of such federal grant, and was withdrawn from settlement by direction of the Secretary of the Interior by orders dated July 12, 1866, and April 22, 1868, respectively.

The company constructed and completed the railroad by January 1, 1880, which was accepted by the Governor of the state, who certified the fact of such completion and acceptance to the Secretary of the Interior prior to February 1, 1880. The railroad was constructed past the land here in question in the year 1879, and not before. On May 26, 1883, the company attempted to select the land in question, with other lands within the indemnity belt, in lieu of lands lost within the place or primary limits of the grant, which selection was rejected by the local land office, from which decision the company appealed to the Secretary of the Interior, before whom the matter remained pending until October 23, 1891, when its selection was by him also rejected. The selection so attempted was not made in accordance with the rules and regulations of the Land Department then in force, in this: that the company did not furnish or tender a list of lands lost in place nor ten-

91 M.—34

der the required fees. On July 22, 1890, under Land-Grant Adjustment Act March 3, 1887, c. 376, 24 St. 556 [2 U. S. Comp. St. 1901, 1595], this land grant was adjusted in the Land Department of the United States, and it was then for the first time found and determined that there existed a deficiency in the place limits of the grant of 922,182 acres, and that all of the lands within the indemnity limits applicable to cover such losses were less than 100,000 acres.

By a judgment of the Supreme Court of the state of Minnesota (State v. Hastings & Dakota Ry. Co., 36 Minn. 246, 30 N. W. 816) rendered on March 23, 1887, the charter and franchises of the company were adjudged forfeited, and the corporation dissolved, subject, however, to the statutory period of three years allowed the company to wind up its affairs. On December 9, 1889, the company, by its deed of that date, conveyed and assigned to Russell Sage, the plaintiff herein, all its property and all its rights and interest in the land in question and all the lands embraced within the land grant, in trust for the benefit of all the preferred stockholders of the company, the deed granting and giving to him the right to maintain and prosecute all actions necessary to carry out the purposes of the trust and assignment, which trust was accepted by him, and he has ever since acted as such trustee and assignee. No receiver was ever appointed for the company. On October 29, 1891, the plaintiff, under the powers vested in him by such deed, selected the land in question, with other lands, on behalf of himself as such trustee and assignee of the company, which selection was in due form, and complied with the rules of the Land Department relating to selections of indemnity lands by railroad companies; but such selection as to the land here in controversy was held for cancellation, and finally cancelled and rejected by the Secretary of the Interior on August 28, 1900, in a contest between plaintiff and the defendants, who claimed the same under the homestead laws of the United States. After the approval of Act Cong. Sept. 29, 1890, c. 1040, § 4, 26 St. 497, repealing so much of the grant of July 4, 1866, as related to lands embraced within the indemnity limits, and on July 15, 1891, the orders withdrawing the indemnity lands were revoked pursuant to instructions from the Secretary of the Interior, and all of the lands in the indemnity belt were restored to the public domain, and opened to private settlement and entry.

On February 6, 1886, the defendant in the first case, Theodore Maxwell, a qualified federal homesteader, settled upon, and has ever since been in the actual possession of, the northeast ¼ of section 25, township 122, range 43, with the intention of claiming the same as a homestead. He offered at the proper local land office a homestead entry thereof in due form, which was rejected on the sole ground that the land had been withdrawn from settlement by the orders herein referred to. He complied in all things at all times with the requirements of the federal homestead laws, and has made improvements on the land which exceed in value the sum of $2,000. He appealed from the decision of the local land office rejecting his application, and the matter was pending until January 23, 1894, when the Land Department affirmed the decision of the local office. He then, and on February 27, 1894, duly made a second application to enter the land as a homestead, which was allowed by the local land office, but it was contested by the plaintiff. Plaintiff's claim to the land by virtue of the grant, and his deed and selection was rejected by the Land Department on June 2, 1900, and Maxwell's application allowed. Final proofs under his entry were made by him and final certificate issued to him on April 27, 1900. On April 9, 1901, a patent for the land was duly issued and delivered to him. On October 10, 1900, he borrowed of the defendant trust company $700, and to secure the payment of it he duly executed to it a mortgage on the land, which was recorded in the proper county. The trust company at no time had any notice in fact of any adverse claim to the land, and on October 22, 1900, it sold in the usual course of business, and for value, the mortgage to the defendant Northwestern Hospital for Women and Children. The mortgage has never been paid.

In the second case the defendant Julius Miller settled with the intention of acquiring it as a homestead upon the northwest ¼ of section 7, township 121, range 42, on February 1, 1886, and he and his grantee have been in possession thereof ever since. On February 17, 1886, the defendant Miller duly made application at the proper local land office to enter the land as a homestead, which was refused. He appealed, and the matter was pending in the Land Department until January 16, 1894, when his application was rejected, and he renewed the application shortly thereafter, and in the month of February, 1894. Such proceedings were thereafter had that a patent for the land was

issued to him on May 3, 1900, he having complied at all times with all of the requirements of the federal homestead laws. The plaintiff contested in the Land Department the defendant's right to such patent. The facts as to his entry and title, except as to the description of the land, improvements thereon, names and dates, are substantially the same as stated with reference to the Maxwell title. After receiving his patent for the land, and on June 2, 1900, the defendant Miller conveyed the land to the defendant Munsterman, who is a bona fide purchaser thereof for value, unless it be held that he had constructive notice of plaintiff's adverse claim to the land if any he has.

Do these facts justify the decision and judgment of the trial court to the effect that the plaintiff has no title, legal or equitable, to the lands which are the subject-matter of these actions? We are of the opinion that the question must be and it is answered in the affirmative. There is some apparent conflict in the decisions of this court, as well as in those of the Supreme Court of the United States, with reference to the legal questions necessarily involved in the conclusion we have reached. The questions, however, save one, are of federal cognizance, and we shall content ourselves with stating the rules of law as finally settled by the federal Supreme Court which are applicable to the facts, without any extended discussion of them. At the outstart it is well to keep in mind that the plaintiff litigated his title with each entryman in these cases in the Land Department, which resulted in the decision that he was not entitled to the lands, but that patents therefor should issue to the entrymen respectively. This decision is conclusive in all courts upon all questions of fact. Gertgens v. O'Connor, 191 U. S. 237, 24 Sup. Ct. 95.

The land grant here in question relates to two classes of lands: (a) Granted or place lands, being the odd-numbered sections within the ten miles in width belt on each side of the center of the railroad as definitely located; (b) indemnity lands, being the odd-numbered sections lying immediately outside the granted lands in a belt ten miles in width. Assuming for the present that the terms of the grant are, in legal effect, substantially like the terms of other federal land grants which have been construed by the federal Supreme Court, the rights acquired by the company by virtue of the grant were these: Its title to the granted lands attached when the line of its railroad was definitely located by the filing of the proper map, subject to the conditions subsequent that the railroad

must be constructed.  But as to the indemnity lands, no title thereto could vest in the company until the deficiency in the place lands was ascertained, and a selection of lieu lands from the indemnity limits made, ' and the selection approved by the Secretary of the Interior.  Such selection and approval were conditions precedent to the vesting of title, and until such conditions were performed the lands, unless withdrawn from market, were open' to private entry and settlement.  Kansas Pacific R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 5 Sup. Ct. 208 ; Barney v. Winona & St. P. Ry. Co., 117 U. S. 228, 6 Sup. Ct. 654; United States v. Missouri, K. & T. Ry. Co., 141 U. S. 358, 12 Sup. Ct. 13 ; Hewitt v. Schultz, 180 U. S. 139, 21 Sup. Ct. 309 ; Southern Pac. R. Co. v. Bell, 183 U. S. 675, 22 Sup. Ct. 232 ; Oregon & C. R. Co. v. United States, 189 U. S. 103, 23 Sup. Ct. 615.

The plaintiff, however, claims that the rule is not applicable to this case, because all of the land in the indemnity belt was insufficient to make up the losses of place lands.  This is answered by the last case cited, in which the court says : "It is also said that all the lands within the indemnity limits were required to supply the deficit in the place limits arising from the disposition prior to definite location by sale and otherwise of lands within the granted limits.  But the extent to which lieu lands could be required to supply such deficit in place lands could not be properly or legally determined until there was an adjustment of the grant in respect of place limits.  In any event, no such adjustment having taken place prior to the date of the settler's bona fide occupancy, his rights arising from that occupancy would not be affected by the fact, subsequently appearing in whatever way, that all the odd-numbered sections in the indemnity limits were needed to supply deficiencies in the place limits."  There was no adjustment of the grant in this case until July 22, 1890.  This is also an answer to the claim that it was not necessary for the company, in its attempted selection of May 26, 1883, to comply with the rules of the Land Department as to furnishing a list of place lands lost.

It is further claimed by the plaintiff that the terms of the grant here in controversy are essentially different from those of the grants construed in the cases cited; hence such cases are not in point.  The act making the grant (section 5 thereof) made it the duty of the Secretary of the Interior to withdraw from market the lands embraced within the

provisions of the act. Other than this the terms of the grant as to indemnity land are substantially like the grants construed in the first three cases cited. We accordingly hold that the company in this case could not and did not acquire any title to or vested equity in any particular land in the indemnity limits until a selection thereof was made, and approved by the Secretary of the Interior.

It may be conceded that all of the indemnity lands were legally withdrawn from market pursuant to section 5 of the grant imposing upon the Secretary of the Interior such duty. But the repeal of section 5 by the act of September 29, 1890, left the matter of continuing or revoking such withdrawal to the discretion of the Secretary. He exercised the discretion, and the withdrawal was revoked July 15, 1891, as to the indemnity lands, save certain exceptions made in the order of revocation. In view of the facts relating to this particular grant, there can be no doubt but that the discretion was fairly exercised. In this connection the following words of the court in the case of St. Paul & S. C. R. Co. v. Winona & St. P. R. Co., 112 U. S. 720, 732, 5 Sup. Ct. 334, 341, are pertinent: "Was there a vested right in this company, during all this time, to have not only these lands, but all the other odd sections within the twenty-mile limits on each side of the line of the road, await its pleasure? Had the settlers in that populous region no right to buy of the government because the company might choose to take them, or might, after all this delay, find out that they were necessary to make up deficiencies in other quarters? How long were such lands to be withheld from market, and withdrawn from taxation, and forbidden to cultivation?"

It is the contention of the plaintiff that the land here in suit was excepted from the order of revocation and restoration. The exception referred to was in these words:

> You are directed to restore to the public domain and open to settlement and entry all lands heretofore withdrawn in your district, within the indemnity limits of the grant for the Hastings & Dakota Railroad Company, and not embraced in selections heretofore made or applied for by said company.

It is an admitted fact that at the time the order was made the lands in controversy were embraced in the selection applied for by the com-

pany on May 26, 1883, which was pending on appeal. The order of revocation and the exception were construed by the Land Department when it determined the contest for the land between the plaintiff and the defendants, the homestead settlers. The construction of this order and the exception may be conceded to have been a question of law, still a proper solution of the question depended in a measure upon the facts found by the department. In view of the facts which it must necessarily have found in deciding the contest, the most favorable construction for the plaintiff that can be given to the order of restoration is that the order as to these particular lands embraced in the selection applied for was suspended until such selection was disposed of. Clearly, the exception relates only to selections already made and allowed and to pending selections; that is, those applied for, but not yet determined. As to the land affected by such pending selections, there could be no good reason for continuing the order of withdrawal after the invalidity of the selections should be determined and the cancellation of the selections were made. When this was done, the matter stood precisely as if such selections had never been applied for. It follows that the revocation of the withdrawal of the land from market and its restoration to the public domain became absolute on October 23, 1891, the date of the decision of the Secretary of the Interior rejecting the pending selections. From that time until October 29, 1891, the date of the second attempted selection, there was nothing in the way of entry of the land by the settlers under the federal homestead laws. Therefore the rights of the homestead occupants, whose applications for the entry of the land were then pending, immediately attached to the land and necessarily defeated the right of the plaintiff to the land under the second attempted selection.

The decision of this court in the case of Sage v. Swenson, 64 Minn. 517, 67 N. W. 544, is inconsistent with the conclusion we have reached in this case, but that case was impliedly overruled by the case of State v. Sage, 75 Minn. 448, 78 N. W. 14. The case of Sage v. Crowley, 83 Minn. 314, 86 N. W. 409, was before the court on a general demurrer to the complaint, which alleged, in effect, that the selection of indemnity land by the company was duly made and approved. For this reason the case is not necessarily inconsistent with the views we have expressed.

Upon the whole record we are of the opinion that the plaintiff failed to show any superior equitable title or right to the land as against the defendants, who hold the land by virtue of patents therefor from the government, and that the judgment appealed from must be affirmed.

So ordered.