CENTRAL OF GEORGIA RAILWAY COMPANY *v.* EVANS.

No. 7708.   FEBRUARY 10, 1931.

*Harris, Harris & Popper, S. M. Mathews,* and *F. S. Mackall,* for plaintiff in error.

*John R. L. Smith, Joseph LeConte Smith,* and *George A. Pindar,* contra.

RUSSELL, C. J. Under the well-settled rule stated in *Georgian Co.* v. *Jones,* 154 *Ga.* 762 (115 S. E. 490), this court is confined in its answers to certified questions to the question propounded in manner and form as the question is propounded, and in the usual acceptation of the meaning of the words in which the question is put. This court can not imply a meaning not authorized by the language of the question, and we can not go outside of the exact question asked, nor can this court examine the record for the purpose of illumining any ambiguity in the question if such should appear. We may sum up the entire question as stated, where it is plain that there is really only one point involved, after taking into consideration all the elements and conditions stated in the question, omitting none.

■ Bearing in mind the statement accompanying the first question, the response may be abbreviated by stating the first instruction desired to be whether Cuba is or is not "an adjacent foreign country" under the original Hepburn act as amended by the Cummins act, and later by the amendment generally known as the Carmack act. U. S. C. A. 87, title 49, sec. 20, par. 11. After a very thorough investigation it is our opinion that this question must be answered in the negative. It is a matter of common knowledge that Cuba is a foreign country, governed by its own regulations and laws. In fact the question does not imply that it is to be doubted that Cuba is a foreign country. The real question, therefore, is whether Cuba is "adjacent" within the terms and meaning of the Hepburn

act and its amendments. It is a matter of common knowledge that the island of Cuba is at least one hundred miles from Key West, which is the nearest point in the United States. In determining, then, whether it is adjacent, we must determine whether a foreign country the nearest boundary of which is one hundred miles from the nearest accessible point in the United States can be construed to be "adjacent" in the definition of the word as synonymous with "contiguous" or "near," or as employing a meaning synonymous with the word "adjoining" or "touching" the boundaries of the United States. Numerous decisions have been cited and examined, in which it has been held by the Interior Department, in passing upon statutes granting right of way to railroad companies through the lands of the United States and giving the transportation companies the right to use timber and other material from lands adjacent to the right of way, in which the courts have gone so far as to hold that in such circumstances the right to use the material extended to any distance near enough to permit the material to be hauled from the lands of the government within hauling distance. There are cases where, on account of natural obstacles or perhaps lack of material, the land from which material could be hauled was not adjacent to the right of way, and yet land from which material could be hauled, though much further away, was nevertheless "adjacent" within the meaning and purpose of the grant. No case has been cited, however, nor have we been able to find one, in which it was held that material taken from land as much as one hundred miles away was held to be "adjacent." In many of these cases, the well-settled practice of the Interior Department in the construction of the word "adjacent" was partly, if not altogether, the basis of the court's decision and of its definition of the word "adjacent." As the Department of the Interior and its Land Office is the executive authority for interpreting and enforcing Federal law as applied to public land, so the Interstate Commerce Commission is the department of government charged with the administration and execution of interstate commerce; and the Interstate Commerce Commission, in construing the words "adjacent foreign country," has more than once held that Cuba is not an adjacent foreign country.

In Lykes S. S. Lines v. Commercial Union, 13 I. C. C. 310, 315, the question was raised as to whether Cuba was an "adjacent foreign

country" within the meaning of the act. The Commission ruled: "The complainant raised the question whether Cuba is 'an adjacent foreign country' within the meaning of the act. The word 'adjacent,' as used in the act to modify the words 'foreign country,' would seem to mean adjacent in the sense of the possibility of substantial continuity of rails. Indeed, as was pointed out in the report to the Senate on the original act to regulate commerce in the year 1886, this meaning is made plain. The report said: "While the provisions of the bill are made to apply mainly to the regulation of interstate commerce, in order to regulate such commerce fairly and effectively it has been deemed necessary to extend its application also to certain classes of foreign commerce which are intimately intermingled with interstate commerce, such as shipments between the United States and adjacent countries by railroad." The Carmack amendment of 1906 made no reference to adjacent foreign countries. This amendment changed the former law in that the initial carrier should be liable for any loss or damage occurring, whether on its own line or that of connecting carriers, where a shipment was made from a point in one State or Territory to a point within another State or Territory; and the courts in interpreting the amendment held the word "State" to refer to a State in the Union, and did not in any way regulate shipments from a point in the United States to a point in a foreign country. Hamlen *v.* Illinois Central, 212 Fed. 324, and Burke *v.* Gulf &c. R. Co., 147 N. Y. Supp. 794. The decision in the Hamlen case was delivered in 1914, and in 1915 the Cummins amendment provided for shipments from a point in the United States to a point in "an adjacent foreign country." The Interstate Commerce Commission again ruled upon the question as to whether or not Cuba, under the transportation act as amended, was an "adjacent foreign country." In Hill *v.* N., C. & St. L. R., 44 I. C. C. 582, 588, the Commission construed the language as applied to Cuba as follows: "Not long since a car-ferry service from Key West to Havana was established. Previously shipments of eggs had been unloaded by the carrier at Key West and reloaded without a charge in addition to the rate. Following the institution of the ferry service, besides the rate on eggs from Chicago, St. Louis, Nashville, Watertown, and Lebanon, a charge of 10 cents per hundred pounds is made when the ferry is used and 5 cents per hundred pounds for

switching at Havana. The defendants deny the jurisdiction of this Commission over these rates and charges, and explain that they show in their tariffs the rate for ocean carriers merely as a convenience for shippers, since they are permitted to do so by our tariff regulations. In Lykes Steamship Company v. Commercial Union, 13 I. C. C. 310, we said that 'The word "adjacent," as used in the act to modify the words "foreign countries," would seem to mean adjacent in the sense of the possibility of substantial continuity of rails.' It was there held that Cuba was not an adjacent foreign country, and it is settled that the Commission has not jurisdiction over traffic from a point in the United States to a point in Cuba."

The Supreme Court of the United States has held it to be a well-settled principle of law that where a body or executive entrusted with the enforcement or administration of statutes has continually given a certain interpretation of the statute, the courts should give it the same interpretation unless the ruling is erroneous as a matter of law, and that as to all matters of fact the construction placed by the administrative power is conclusive. So it was held in Gertgens v. O'Connor, 191 U. S. 237 (24 Sup. Ct. 94, 48 L. ed. 163), that the "decision of the land department in a contest case is conclusive in the courts upon all questions of fact." This was a case in which the land office of the Interior Department had construed the words "bona fide purchaser" as found in the act of March 3, 1887, 24 Stat. 556, not to have been used in its legal technical sense, but only as requiring good faith in transactions between a railroad company and parties contracting with them in respect to lands; and the point as to the conclusiveness of the decision of the executive department charged with the administration of a particular statute was approved and followed in Logan v. Davis, 233 U. S. 613 (34 Sup. Ct. 685, 58 L. ed. 1121), in which Mr. Justice Van Devanter, delivering the unanimous opinion of the court, after refusing to dismiss the writ of error upon the ground that the judgment was not subject to review, said: "And as the Secretary of the Interior found, from the evidence submitted in the contest before the Land Department, that Logan was a purchaser in good faith in the sense of the adjustment act, and no basis was laid in the pleadings or agreed statement of facts for rejecting or disturbing that decision save as it was said to be

grounded upon error of law and misconstruction of the statute, it is manifest that unless some of the objections urged against it on that score are well taken, Logan's title should be sustained. . . The act of 1887, in its first section, authorized and required the Secretary of the Interior immediately to adjust, in accordance with the decisions of this court, the several land grants made by Congress to aid in the construction of railroads 'and heretofore unadjusted.' . . Prior to the act of 1887 the administration of the several railroad land grants rested with the Land Department, of which the Secretary of the Interior is the head (Catholic Bishop of Nesqually v. Gibbon, 158 U. S. 155, 166-7 [15 Sup. Ct. 779, 39 L. ed. 931]), and some of the lesser grants had progressed to a final adjustment in regular course of administration. It was because of this that the restrictive words 'and heretofore unadjusted' were inserted in the act. They meant only that adjustments theretofore effected by the Land Department in regular course were not to be disturbed." And in reversing the decree and judgment of the Supreme Court of Iowa it was stated: "As it thus appears that the decision of the Secretary of the Interior was right in point of law, and as it was conclusive upon all questions of fact (Gertgens v. O'Connor, supra), it follows that the State court erred in not sustaining Logan's title obtained under that decision."

In New Haven Railroad v. Interstate Commerce Commission, 200 U. S. 361 (26 Sup. Ct. 272, 50 L. ed. 515), the Supreme Court of the United States spoke as follows: "Now, without at all intimating that as an original question we would concur in the view expressed in the case last cited, that to have applied the act to regulate commerce, under proper rules and regulations for the segregation of the business of producing, selling, and transporting, as presented in the Haddock and Coxe cases, would have been confiscatory, and without reviewing the rulings made by the Interstate Commerce Commission in those cases and adhered to by that body during the many years which have followed those decisions, we concede that the interpretation given by the Commission in those cases to the act to regulate commerce is now binding, and, as restricted to the precise conditions which were passed on in the cases referred to, must be applied to all strictly identical cases in the future, at least until Congress has legislated on the subject. We make this concession because we think we are constrained to

do so, in consequence of the familiar rule that a construction made by the body charged with the enforcement of a statute, which construction has long obtained in practical execution, and has been impliedly sanctioned by the re-enactment of the statute without alteration in the particulars construed, when not plainly erroneous, must be treated as read into the statute." Barnes' Treatise on Interstate Transportation, 79, § 31, par. C, referring to the transportation act, states that "an adjacent foreign country" means a foreign country to which there was a substantial continuity by railroad. A construction which would make Cuba "an adjacent foreign country" would be so general as that it perhaps might be applied to any of the islands of the West Indies on either coast of Florida. The definition would be so indefinite as not to be susceptible of any definite construction, and an enforceable construction must not be so broad as to cause confusion. We bear in mind the argument of counsel for defendant in error that "an adjacent foreign country" does not necessarily mean a foreign country whose boundaries adjoin ours continuously; for in that event Canada would not be an adjacent foreign country, because the Great Lakes for several hundreds of miles prevent the territories of the United States and Canada from adjoining. However, as it appears from the report of the Senate committee prior to the passage of the transportation act that Congress took into consideration the fact which was one of common knowledge, to wit, that there was continuity of transportation by rail both to Canada and to Mexico, and no such condition obtained as to Cuba, the argument seems to be inapplicable to the instruction requested. While it is merely persuasive authority, the Special Court of Appeals of Virginia, in Southern Ry. v. Southgate, 149 Va. 683 (140 S. E. 661), has definitely decided and directly held that Cuba was not adjacent foreign territory as that term is used in the Hepburn act.

■ The second question of the Court of Appeals is not so readily answered. Nevertheless, upon careful consideration, we are satisfied that the question should be answered in the negative, and that the instruction should be that it is not the duty of a carrier engaged to transport a shipment to a foreign country to inform the shipper as to the requirements enforced by the foreign jurisdiction which anteceded and are a condition precedent to the shipper or his assignee regaining possession of the shipment. Even if it is to be

presumed that the carrier is acquainted with the foreign regulations (which we do not decide), the shipper, even if ignorant (as appears from the question) of the requirements governing the entry of goods into the port of Havana, knows that Cuba is a foreign country, and in the exercise of ordinary care for the protection of his own property should acquaint himself with the laws governing the delivery of freight in this foreign country. He could acquire knowledge of the requirements by that degree of ordinary care which every prudent man must exercise for the safety and preservation of his property, and thus, being charged with knowledge of that which he could have obtained, constructively is presumed to know that his goods could not be delivered to any consignee unless and until the way-bills which were delivered to him by the carrier were at Havana for inspection and approval by the Cuban authorities at Havana. So that in so far as the shipper in this case was ignorant, it would appear to be only evidence of negligence upon his part. The operation of any rule different from that just stated would greatly curtail interstate commerce and commerce with foreign countries. If the carrier were obliged to notify the shipper that his goods could not be delivered unless and until the bill of lading was exhibited and viséd by the Cuban consul, say at Tampa, Florida, then the shipper could not make what is ordinarily known as an order-notify shipment—the bill of lading attached to a draft on some firm in Cuba, under which the shipper would receive payment from a consignee of whose solvency he was not fully satisfied, before the delivery of the goods to the consignee, the consignee taking up the bill of lading by paying the draft. The shipper could not change the consignee while the shipment was in transit unless he himself communicated with the new consignee and notified the carrier, and this would be pro tanto an alteration of the original bill of lading. As the carrier is not expected to collect the purchase-price of the shipment in behalf of the shipper, it would not seem proper to impose upon the carrier an additional duty which he did not undertake in the issuance of the original bill of lading. At any rate, if the shipper preferred to make his shipment order-notify, and attached his bill of lading to a draft payable at one of the banks in Havana, and even if the carrier were required before accepting the shipment to inform the shipper that the bills of lading properly viséd must be presented to the Cuban

authorities at that port before the shipment could be released, so that the consignee could accept it, it does not appear how the carrier could obtain the bills of lading from the bank to which the shipper had transmitted it, without itself paying and discharging the draft. It thus appears that the only valid conclusion is that we have reached—that the shipper, in the exercise of ordinary care, will inform himself of the regulations of the foreign country to which he wishes to ship, and comply therewith. All law is based upon reason and supported by valid reasons. No shipper can recover against a carrier for any injury due to the shipper's own negligence, any more than if the shipper had designedly injured or destroyed his own goods after they had been delivered to the carrier.

As remarked in regard to the case of Southern Ry. Co. v. Southgate, supra, the ruling in Pecos &c. Ry. Co. v. Jarman (Tex. Civ. App.), 138 S. W. 1131, cited by defendant in error, is also only persuasive authority and not controlling upon this court. However, were we willing to be guided by the ruling of the Court of Civil Appeals of Texas, we could not be controlled by it, for the facts of that case were quite different from those involved in the case at bar. A shipment of cattle was involved, and it was held that it was the duty of the carrier to see that a certificate of inspection, as provided by the regulations of the Secretary of Agriculture, accompanied the shipment to destination. Of course in that case the necessary inspection tag could very well have been sent along with the way-bill. On the other hand, as we have pointed out, it would have been impossible for the railroad company to have accompanied the shipment with the original bill of lading and viséd invoice. There is quite a difference between carrying with the bill of lading certificates of inspection, and handling clearance papers through a port which is governed by customs regulations. Furthermore, the regulations promulgated by the Secretary of Agriculture provided expressly that the inspection certificate should accompany a shipment of cattle, and these regulations were matters of public knowledge. The case of Cownie Glove Co. v. Merchants Dispatch Trans. Co., 130 Iowa, 327 (106 N. W. 749, 4 L. R. A. (N. S.) 1060, 114 Am. St. R. 419), involved a shipment of gloves for handling from Erlangen, Germany, to Des Moines, Iowa. Under these circumstances they were stopped by the customs authorities at the port of New York, and were damaged. The court held, that,

under the agreement between the consignor and the carrier that the gloves were to be delivered in Des Moines in bond, it was the duty of the carrier to see that the shipment passed through the port of New York. The court held that if any duty rested on the carrier, it was because of the express contract between the carrier and the consignor to deliver the goods in bond in Des Moines, and the carrier's agreement to take exclusive charge of the shipment and to release the plaintiff from any care in connection therewith, at least as far as the clearance of the goods at New York was concerned. In the instant case it appears from the question that the property was promptly unloaded at the destination, Havana, where it was stopped at the point of entry on account of the plaintiff's failure to have the necessary clearance papers.

■ The third question must be answered in the affirmative. While it is the duty of the carrier to receive and safely deliver all shipments received by it for transportation, and the Code of 1910, § 2712, in consonance with the common law, accepts no excuse except the act of God and the public enemy, an exception to this sweeping rule has long been recognized, that if delivery by the carrier has been prevented and rendered impossible by the seizure of the shipment in the enforcement by properly constituted legal officials of existing laws, the carrier is bound not to violate the law by making delivery of the goods which have been seized by properly authorized officers. The carrier in this case is not required to smuggle the goods into Cuba in violation of Cuban regulations, or to forcibly resist the execution of the regulations imposed by Cuban authority. Numerous authorities supporting our conclusion might be cited from the Federal courts as well as in our own State. In *Savannah &c. R. Co.* v. *Wilcox,* 48 *Ga.* 432, this court held that the liability of a common carrier ceases if the goods are taken from its possession by legal process. In Stiles *v.* Davis, 1 Black, 101 (17 L. ed. 33), Mr. Justice Nelson delivered the opinion of the Supreme Court of the United States, where certain goods were seized in Chicago by attachment, which were to be conveyed from Janesville, Wisconsin, to Ilion, Herkimer County, New York. The judge in the lower court had charged the jury "that any proceedings in the State court to which the plaintiffs were not parties, and of which they had no notice, did not bind them or their property; and further, that the fact of the goods being

garnished as the property of third persons, of itself, under the circumstances of the case, constituted no bar to the action;" but he said that the jury might weigh that fact in determining whether or not there was a conversion. The Supreme Court ruled: "We think the court below erred. After the seizure of the goods by the sheriff under the attachment, they were in the custody of the law, and the defendant could not comply with the demand of the plaintiffs without a breach of it, even admitting the goods to have been, at the time, in his actual possession. The case, however, shows that they were in the possession of the sheriff's officer or agent, and continued there until disposed of under the judgment upon the attachment. It is true that these goods had been delivered to the defendant, as carrier, by the plaintiffs, to be conveyed for them to the place of destination, and were seized under an attachment against third persons; but this circumstance did not impair the legal effect of the seizure or custody of goods under it, so as to justify the defendant in taking them out of the hands of the sheriff. The right of the sheriff to hold them was a question of law, to be determined by the proper legal proceedings, and not at the will of the defendants, nor that of the plaintiffs. The law on this subject is well settled, as may be seen on a reference to the cases collected in sections 290, 350, 453 of Drake, Attach. 2d edition." Following this deliverance, Mr. Justice Nelson quoted approvingly from several English cases recognizing the same principle as an exception to the general rule which allows a common carrier no excuse for non-delivery, other than the act of God and of the public enemy. Omitting, for the purpose of brevity, reference to the cases cited on the brief of counsel for both parties in this case, we content ourselves with employing the language of Judge McCay in *Savannah &c. R. Co.* v. *Wilcox,* supra: "It is true that the text-books, including our Code, do announce that a common carrier can set up no excuse for the loss or destruction of goods but the act of God or the enemies of the State. But this has always been qualified with certain limitations as to when his liability ceases, when he is discharged from further prosecution of his undertaking, as if the owner of the goods himself receives them short of the place of destination, or if they are not delivered by the fault of the owner; or . . that they have been taken from the carrier by legal process. . . If the warrant was legal, it was not in

bad faith to the consignor for the agent to furnish all proper facilities to the sheriff to perform his legal duty. The evidence shows nothing but a proper performance of that duty which every man owes, as a good citizen, to the majesty of the law. We should hesitate long before we would say there is any relation in life that would make it the duty of one . . to shut out the sheriff who comes to execute a legal process. He may do so, it is true, in a certain class of cases, and the law may thus be baffled; but we know of no case where it is a man's duty to baffle the law."

*All the Justices concur, except Beck, P. J., absent for providential cause.*