DAVID MUNRO ROGERS and Others v. CLARK IRON COMPANY and Others.[1]

May 15, 1908.

Nos. 15,324—(95).[2]

**Public Land—Fraudulent Application—Delivery of Patent—Homestead Scrip.**

Plaintiffs, as heirs at law of James M. Rogers, of Arkansas, who died in 1896, brought this action to quiet title to an undivided interest in lands in St. Louis county against defendants in adverse possession under various claims of title. Plaintiffs' title rested in a United States patent issued to James M. Rogers in 1880, which remained in the Duluth land office. Among the preliminary proceedings on which it was based were: An

[1] Reported in 116 N. W. 739.       [2] October, 1907, term calendar.

application (in July, 1875) to make entry upon one hundred twenty acres, the description of which was left blank, as an additional homestead according to congressional laws for the benefit of honorably discharged Union soldiers and sailors; an affidavit, sworn to (at the same time) before Freed by J. M. Rogers, that he was entitled to the benefit of these laws as a Union soldier who had previously made entry for a homestead of forty acres in Arkansas; and a location in the Duluth land office (in December, 1875) by means of soldiers' additional homestead scrip, upon the one hundred twenty acres here in controversy. Plaintiffs' ancestor was not an honorably discharged Union soldier, but had served in the Confederate army. Plaintiffs at one time during the trial asserted that he had signed the fraudulent application and sworn to the false affidavit, and afterwards, and finally, that these signatures were forgeries, and that the patent, a gift to him by the federal government, and all preliminary proceedings, were validated by the federal statute of limitation.

Defendants sought to show, inter alia, an outstanding title in Baker; that plaintiffs' ancestor in fact had made the application and had sworn to the affidavit; that at the same time he had executed a blank power of attorney, covenanting for further assurances, and sold through Freed a full set of soldiers' scrip to Gilmore; that Gilmore sold the scrip and executed a power of substitution to Baker, who located the land; that final receipts were delivered to him; and that he thus acquired the equitable title until the issuance of the patent, when the full beneficial ownership passed to him. Defendants did not, and were unable to, produce the original powers of attorney on which Baker's title rested. It is *held* that:

(1) The introduction of the patent made out prima facie title in plaintiffs, although it remained in the Duluth land office. Title by patent from the United States is title by record, and delivery of the instrument to the patentee is not, as in a conveyance by a private person, essential to pass the title.

(2) It was competent for defendants, who were in adverse possession, by adequate pleading to defeat plaintiffs' action by showing a title outstanding in a third person, without connecting themselves with that title.

(3) Under the general denial, defendants were entitled to show an outstanding title in Baker, by proving facts on which it was based, and by invoking the rule that an interest which subsequently accrues may feed an estoppel, and other legal or equitable principles applicable to such facts.

(4) The burden of proof rested on defendants to establish such outstanding title by competent, strong, and satisfactory evidence.

(5) Rogers' soldiers' additional homestead scrip was personal property and assignable, notwithstanding the opposed practice of the federal land office.

(6) Four principles of evidence in particular apply to the testimony adduced to show the existence and contents of the missing powers through which title was transferred from Rogers to Baker, viz.:

(a) The acts of federal officials in allowing the location, executing the final receipts, and issuing the patent constitute evidence that all preliminary steps necessary thereto have been properly taken.

(b) The existence and contents of a lost or destroyed instrument of great age may be shown by the best evidence obtainable under the circumstances.

(c) Proof of business habit or custom is properly admitted in evidence in corroboration of the defective memory of a witness with respect to the existence and contents of such missing instruments.

(d) Proof of actual use of a definite and conventional form of a power of attorney justifies a satisfactory inference as to the contents of such powers.

(7) The finding of the trial court as to the genuineness of Rogers' signature to the fraudulent application and entry, the existence and contents of the lost powers of attorney, the location by Baker, and the delivery to him of the final receipts, were sustained by competent evidence, consisting in part of oral testimony, of documentary evidence, and of testimony as to the course of business and the use of conventional forms, and by the presumption of performance of official duty.

(8) Those powers were beneficial and irrevocable, and did not terminate with Rogers' death.

(9) They were adequate in terms and form to convey to Baker the interest of Rogers.

(10) After the location, Baker had a vested and substantial interest in the lands.

(11) Upon the issuance of the patent to Rogers, his heirs and assigns, the beneficial ownership of the lands passed to Baker, by the doctrine of relation or of enforced estoppel.

(12) That defendants were not in privity with Rogers did not prevent the application of those doctrines to vest title in Baker in furtherance of the patent. Gibson v. Chouteau, 13 Wall. 92, distinguished.

(13) Plaintiffs were estopped to use Baker's location as vesting title in their fraudulent ancestor and to repudiate it as conferring any interest in him as a bona fide purchaser for value. "Qui approbat, non reprobat."

(14) The finding of the trial court that defendants had established an outstanding title in a third person should not be disturbed.

Action in the district court for St. Louis county to determine adverse claims to certain real estate. The case was tried before Cant, J., who made findings and ordered judgment in favor of defendants.

From the judgment entered thereon and from an order denying their motion to set aside the conclusions of law and for a new trial, plaintiffs appealed. Affirmed.

Plaintiffs, as heirs at law of James M. Rogers, deceased, brought this action against the defendants to quiet title to an undivided interest in lands situated in St. Louis county, Minnesota, to restrain the defendants from making claim thereto, or in any manner intermeddling therewith or trespassing thereon, or removing any iron ore or other products therefrom, for an accounting for ore previously removed therefrom by the defendants in possession, and for other relief. The land which was thus referred to and which is here in controversy is the west one half of the southwest one quarter and the southwest one quarter of the northwest one quarter of section 28, township 58 North, range 20 West, containing one hundred twenty acres, more or less. The answer included a general denial. The case was tried by the court.

Plaintiffs' claim of title involved this history: James M. Rogers, of Johnson county, Arkansas, their ancestor, on January 22, 1868, made a homestead entry in Arkansas upon forty acres of land. Soldiers and sailors who had served in the War of the Rebellion and who had previously entered homesteads of less than one hundred sixty acres under the laws of the United States were entitled to enter additional area, which, together with the amount of the original homestead, would make one hundred sixty acres, under section 2306, R. S. U. S. (Act June 8, 1872, c. 338, § 2), 17 St. 333, and (Act March 3, 1873, c. 274), 17 St. 605. Plaintiffs' ancestor, James M. Rogers, was not in fact an honorably discharged Union soldier, but had served in the army of the Confederacy. Pursuant to these provisions, application numbered 1,291, signed by "J. M. Rogers," was made for an additional entry, which in its final form as introduced into evidence was dated on December 14, 1875, recited that he was entitled to the benefits of the second section of the act of June, 1872, that he applied to enter the premises first herein described as additional to his original homestead in Arkansas, and that final proof of the original homestead had been made at Dardanelle, Arkansas, land office, August 4, 1873. On July 19, 1875, "J. M. Rogers," of Johnson county, Arkansas, made affidavit before M. M. Freed, receiver, referring

by number to the previous application, and swore that he had previously made the homestead entry for forty acres and had complied with the law in respect to that homestead, as appeared in the records of the land office at Dardanelle, Arkansas. The register of the land office certified that "J. M. Rogers" filed that application, No. 1,291, and that he paid the fee prescribed by law. Five months after, on December 14, 1875, the receiver of the land office at Duluth acknowledged the receipt on that day of the fee and compensation of the register and receiver for entering land accordingly, and the register of the land office at Duluth issued a certificate (No. 758) that pursuant to this congressional legislation, "James M. Rogers" made payment in full for the premises in St. Louis county previously described, and "that on presentation of this certificate to the commissioner of the general land office the said James M. Rogers shall be entitled to a patent for the tract of land above described." The final patent to James M. Rogers, his heirs or assigns, dated April 15, 1880, in accordance with the additional homestead entry to the land in St. Louis county previously described, was filed for record February 26, 1892, and remained in the land office at Duluth. Plaintiffs' ancestor, James M. Rogers, died in 1896. The heirship of plaintiffs as his children was admitted. On March 3, 1891, congress prohibited any action to vacate any patent previously issued unless such action should be brought within five years after the passage of the act. Act March 3, 1891, c. 561, § 8, 26 St. 1099. Plaintiffs relied upon the patent to the land, as will subsequently appear—at one time upon that patent as executed in pursuance of the application and location by their ancestor; at another time upon it as issued upon forged signatures of their ancestor to the instruments of entry—and upon the statute of limitation which had rendered that patent incontestable after March 3, 1896.

The defendants asserted, for one defense, that they owned the land in fee. One basis of this claim of title was that they were at the time of bringing the action in possession, and had been in continuous possession under claim of adverse title since 1892; that they made valuable improvements without objection on the part of the plaintiffs or any one else; and that they had paid the taxes levied on the land, whereas none of the plaintiffs had directly or indirectly paid taxes.

Another claim of title was a deed to the premises, executed to one of the defendants for a valuable consideration by one James M. Rogers, whom the trial court found not to be, in fact, the James M. Rogers who made the homestead entry.

The third claim of title was through a deed executed by the probate court of St. Louis county on behalf of plaintiffs (minors) for $14,000 in cash and $50,000 in stock in the Clark Iron Mining Company, conveying to defendants all the interest of plaintiffs in these premises.

The final claim of title by defendants was under a tax deed issued by the state of Minnesota, on which notice to eliminate the right of redemption had been given, as defendants claimed, in strict accordance with the statute.

Defendants' further defense, as considered in this opinion, was that plaintiffs' ancestor had sold all his rights in the premises. On the day that plaintiffs' ancestor, James M. Rogers, applied for the soldiers' additional scrip, he sold it through M. M. Freed to Charles D. Gilmore, of Washington, District of Columbia. At the time of the sale Rogers executed and delivered to Freed (1) a power of attorney, beneficial to the donee, who was not named, irrevocable and sufficient in law to pass title to the land to the remote donee in the usual form used for that purpose; (2) the application; (3) the affidavit; (4) proof of military service. These four papers constituted what was known as a "full set of soldiers' additional homestead scrip." This scrip did not contain a description of the land. That description was, in accordance with recognized practice, to be thereafter filled in on location. Gilmore sold the scrip to General J. H. Baker, of Mankato, Minnesota, and executed to General Baker a substitute power of attorney similar to that previously described, whereby Baker, thus authorized and empowered to locate the land, located the land at the land office in Duluth December 14, 1875, by means of the scrip. The patent was thereafter issued in the name of Rogers in accordance with a ruling in the land office which the supreme court of the United States afterwards held to be erroneous. In consequence the beneficial ownership in the property passed to and remained in Baker. In the view here to be taken of these transactions, the controversy concerns this outstanding title.

Only an undivided interest of the plaintiffs is involved in this controversy. The remaining undivided interest, for present purposes, as appears to have been conceded, passed to defendants by a deed from the widow and other heirs of James M. Rogers. The trial court, inter alia, found that the application for additional entry and the affidavit in connection therewith were made by the father of the plaintiffs, that plaintiffs' ancestor sold the beneficial interest to Baker, and concluded that plaintiffs were entitled to no relief. This appeal was taken from an order denying the usual alternative motion.

It will be assumed in this decision that the deed to the defendants executed by James M. Rogers of Arkansas was not executed by plaintiffs' ancestor, who actually made the application and affidavit, and in whose name the patent was issued, but by another person of the same name, known as "Uncle Jimmy." It will also be assumed that the sale of plaintiffs' interest to defendants made by the probate court, and the tax title, were void, and that the Baker claim operated, if at all, to defeat plaintiffs' recovery only as an outstanding title because of which defendants had no interest in the land.

Baker is not a party to the controversy. What his rights may be as against the defendants is not properly before us on this appeal. No power of attorney from Rogers or any assignee of Rogers was produced. Defendants' inability to produce such power was shown. The testimony on which defendants rely to show the transfer to Baker of the rights of plaintiffs' ancestor may be summarized—as favorably to plaintiffs as reasonably may be—as follows:

In 1875 Freed was receiver of the land office at Dardanelle, Arkansas. He testified that the application and affidavit (Exhibits 38 and 39, respectively), on which the patent to Rogers was based, was in his own handwriting, with certain named exceptions, especially that the description therein inserted was in another writing. In the original application the description of the lands to be located was left blank. The applicant was required to furnish proof of military service, of former homestead, and of honorable discharge. The affidavit for additional homestead was sworn to in his presence by James M. Rogers. To the best of his knowledge and belief, and not relying merely on memory of custom and practice, "James M. Rogers was the Rogers representing himself making this additional homestead entry." Rogers

sold him his (Rogers') rights under the application at the time it was made. Rogers then and there delivered to him the application, and affidavit, proof of military service, and power of attorney to locate the lands. The power of attorney was in the form of Exhibit 41. This form "was always used by me." Q. "That is your present recollection—it was always used by you? A. It is my absolute conviction. I know it. There is no recollection to it." Between the first and the fifteenth of August Rogers was paid for this sale "the price per acre then prevailing." Freed sold his claim to Gilmore, between the first and fifteenth of August, 1875, together with other claims, at the uniform price of one dollar per acre. The full usual set of papers were delivered to Gilmore. This was the usual and regular way of doing business. It was "part of the procedure" of transferring the applicant's rights. "To his absolute knowledge" he could say "that that particular paper [the power of attorney from Rogers] had been turned over to Gilmore. Otherwise Gilmore would not have accepted, because the papers would have been worthless. No soldiers' additional scrip was ever purchased by Gilmore, unless accompanied by the soldiers' power of attorney of the same form and character." Defendants' Exhibit 42 (which will hereafter be more fully described) he identified as being a list of pieces of scrip which he had sold to Gilmore. The indorsement (hereinafter set forth in full) on the outside was in Gilmore's handwriting. He had a memorandum of his own, containing the same names as Exhibit 42. On cross-examination, Freed admitted the possibility of a false impersonation of the man whose jurat he took. He did not then recollect having seen or talked with Rogers, but he added: "Why, I knew the man." He also admitted that he had no independent recollection of the personality of the man, or of the facts connected with the transaction, or of the making of the power of attorney, or as to when it was made, or whether Rogers' wife signed it, or whether he (Rogers) had a wife.

Exhibit 42, to which the witness Freed referred, was produced by one Sherman, a lawyer living in Washington, District of Columbia, who for eighteen years had had a continuous and unbroken custody of the papers and books of Gilmore, deceased, including the box from which that exhibit had been taken. This box he received from the

widow of Gilmore. The exhibit in question was a statement of account between Freed and Chipman, Hosmer & Co. Gilmore had been a member of that firm. Its affairs had gone into the hands of a receiver. Exhibit 42 itself, dated November 28, 1879, charged Freed with cash items and to the amount of the "cost price of the following cases of additional homesteads proving fraudulent or otherwise bad" and credited him by additional homesteads at the uniform price of one dollar per acre. In course of a long list of such lands appeared the entry:

James M. Rogers (acres) 120 ($) 120.

The statement was indorsed:

Copy of Chipman, Hosmer & Co. vs. M. M. Freed, $2,591.51.
Original sent to N. Wilson, receiver, Dec. 2d, 1879, and asked him to have it attended to.                    C. D. G.

General Baker testified that he had purchased about twenty six or twenty seven pieces of soldiers' additional homestead scrip, including the scrip here in question, from his old acquaintance, Gilmore. He located that scrip on December 14, 1875, at the land office in Duluth. He selected lands from the plats himself. He did not go to Duluth personally, but sent Snow, his chief clerk. He afterwards received from the land office in Duluth the final receipts for all the lands that he located, including the original receipt for the additional homestead entry No. 758, being the one here in question. Baker and his assistant, Snow, the same person who located the land, who was "an expert in these matters," now dead, "examined very carefully" the papers delivered to Baker by Gilmore. "I do not remember just the form [of the power of attorney]. I knew it was the accredited and accepted form." Mr. Snow examined them at his request and "under his eye." The papers were what is called "a full set." Baker was not an expert in these matters, but felt satisfied on this point. He remembered that the instruments were of the character of the exhibits produced on trial. "The application, affidavits, and certified copy of the discharge, and power of attorney, was in each set of papers." Charles D. Gilmore's name was inserted in very large letters, I remember very distinctly" * * * "in the power of attorney, because I wouldn't take any additional homestead that did not contain his name

with the power of attorney to him." I suppose in each set of papers there was a power of substitution like [Exhibit 43]. "I looked into that myself—to see that the power of substitution was there. I supposed this [the blank form on which defendants relied] was the form of the paper." It is my belief that this was the precise form.

In pursuance of subsequent negotiations with the Nelson Lumber Company, he sold to that company all but five of the tracts located under the twenty six or twenty seven pieces of scrip. He handed all the papers, none of which had been recorded, to that company; the donee of the substituted power being left blank. One of the five tracts which he retained was the Rogers' homestead entry No. 758. He subsequently handed the five sets of complete papers, certainly the receipts, including the Rogers set, to his cousin, a land attorney, one Heaton, at Washington, D. C., and requested him to examine them, and see that they were correct, and what the situation was. Heaton reported to General Baker by letter. This letter, dated November 11, 1885, acknowledged the receipt of the original receipts which General Baker had sent Heaton, including No. 758, and stated other matters not material here. Heaton testified in person, and corroborated the delivery to him by Baker of the five sets of papers—"five receipts, as I call them"—and the writing by him to General Baker of the letter referred to.

A witness Thompson testified: He had done the clerical work in the land offices at Duluth, among other times, during the month of December, 1875. Both the register and the receiver were now dead. He had a definite recollection of filing the plats of towns 58—20 and 59—20, and certain initials on those plats were in his handwriting. On the plat of the town No. 58—20 he had initialed a description of the premises here in controversy, and had written beneath it the figures "758," the number of the Rogers' certificate. He recalled the location of soldiers' additional scrip on those towns on that day. No one of them was "laid" by any soldier who appeared in person. The scrip was presented by different persons in bunches. The applicants gave him the additional homesteads and the lands they wanted to select. He filled out the description in the application. It was he who wrote in the Rogers application "the west half of the southwest" one quarter and the "southwest" one quarter "of the northwest" one quarter "of sec-

tion 28, town 58, range 20 W. 4th P. M." It was he who wrote on the affidavit (Exhibit 39) the number of the application, "1,291." He pinned the official receipt and the official certificate to the respective powers of attorney. He named a number of parties who presented bunches of these applications on that day, among others Mr. F. E. Snow, whom he knew as head clerk of General J. H. Baker's office.

Mr. J. W. Hunt, an attorney in Duluth, testified to certain entries appearing on the records of the Duluth land office and of the office of the register of deeds of St. Louis county. His testimony corroborated that of Mr. Thompson in many important respects, especially as to the entries made, as to the bunches of soldiers' scrip received by him on that day, which included General Baker's twenty seven pieces. All of these, except five, including the one in issue, appeared to have been conveyed to the Nelson Lumber Company. Other evidence was introduced and received as corroborative of title in Baker.

*Daniel G. Cash, J. B. Richards,* and *Fannin & Beckett,* for appellants.

*John G. Williams, L. W. Wolcott,* and *Oscar Mitchell,* for respondent Clark Iron Company.

*Joseph B. Cotton* and *Frank D. Adams,* for respondent American Mining Company.

*W. R. Begg* and *C. O. Baldwin,* for respondent Leonard Iron Mining Company.

JAGGARD, J. (after stating the facts as above).

1. Plaintiffs by introduction of the patent made out a prima facie case. The mere fact that the patent remained in the office at Duluth and was never delivered to the plaintiffs did not prevent the vesting of title. Title by patent from the United States is title by record, and delivery of the instrument to the patentee is not, as in a conveyance by a private person, essential to pass the title. U. S. v. Schurz, 102 U. S. 378, 26 L. Ed. 219; U. S. v. Laam (C. C.) 149 Fed. 581.

2. The present is an action to quiet title, asking different kinds of equitable relief, brought against defendants, who are in adverse possession. If it be conceded, as plaintiffs claim, that this is not strictly a possessory action, yet they have never been in possession of the premises, and it is certain that they are not entitled to any relief, un-

less they have title thereto. Hence, any evidence tending to show that the title was in a third party was admissible, and the rule is here applicable that "possession is title, and is good title, against all the world, except those who can show a better one." Mitchell, J., in Herrick v. Churchill, 35 Minn. 318, 29 N. W. 129. And see Wheeler v. Winnebago Paper Mills, 62 Minn. 429, 431, 64 N. W. 920; Jellison v. Halloran, 40 Minn. 486, 42 N. W. 392; Linthicum v. Ray, 9 Wall. 241, 19 L. Ed. 657; Tyler, Eject. & Adv. Enj. 724, et seq. Cf. Moore v. Tice, 22 Cal. 516; Dyson v. Bradshaw, 23 Cal. 536; Coryell v. Cain, 16 Cal. 567. It was competent for defendants by adequate pleading to defeat the action by showing that title was outstanding in a third person, without connecting themselves with that title. Trenouth v. Gordon, 63 Cal. 379; Sedgwick & Wait, Trial of Title to Land, p. 700, § 831.

3. The admission of proof of the outstanding title in Baker was not reversible error. The old and subtle distinctions between evidence admissible under a general denial and evidence admissible under a special plea only are no longer recognized. For the nicety formerly observed in that regard has been substituted a considerable liberality. Rees v. Storms, 101 Minn. 381, 112 N. W. 419. On general principles, moreover, under the general denial, the defendants were entitled to show anything tending to controvert and overthrow plaintiffs' case and to defeat the action. This logically includes proof of an outstanding title or right to possession in a third person. Bliss, Code Pl. § 328. And see Moore v. Tice, 22 Cal. 516; Wakefield v. Day, 41 Minn. 344, 43 N. W. 71. Cf. Wheeler v. Winnebago Paper Mills, 62 Minn. 429, 64 N. W. 920; Raynor v. Timerson, 46 Barb. (N. Y.) 518 (collecting cases at page 526); Wicks v. Smith, 18 Kan. 508; Bernard v. Elder, 50 Miss. 336; Stewart v. Camden, 33 N. J. L. 115; Zeigler v. Fisher's Heirs, 3 Pa. 365; Hogg v. Link, 90 Ind. 346; 1 Enc. Pl. & Pr. 825. Surprise, moreover, is not alleged as a ground for a new trial. Section 4198, subd. 3, R. L. 1905. It does not affirmatively appear what evidence in rebuttal plaintiffs could now adduce. Prejudice does not appear.

The right to defend by means of an outstanding title in a third person necessarily involves the right to prove it under recognized rules of evidence and by the application thereto of appropriate principles of

substantive rights. Under the code practice of this state it is immaterial whether those principles be legal or equitable. For example, in an action to try title, a defendant in possession, who has proved a previous warranty deed executed by plaintiff to a third person before plaintiffs acquired title, may invoke the familiar doctrine that the interest, when it accrues, feeds the warranty. See Doe dem. Christmas v. Oliver, 10 B. & C. 181, 2 Smith, L. Cas. (8th Ed.) 775; Webb v. Austin, 7 M. & G., at page 724. By the same reasoning he may invoke the so-called "equitable doctrine of relation." It is to be borne in mind that, on the contrary, "in the federal courts where the distinction between legal and equitable proceedings is strictly maintained, and remedies afforded by law and equity are separately pursued, the action of ejectment can only be sustained upon the possession by the plaintiff of the legal title." Mr. Justice Field in Gibson v. Chouteau, 13 Wall. 93, at page 102, 20 L. Ed. 534. The effect of this case, as will presently appear, is an important consideration in the determination of the rights of the parties to this action.

4. The burden of proof rested on the defendants to establish a valid outstanding title in General Baker by sufficient and competent evidence. While the sale of the soldiers' right to additional homestead has often been regarded as governed by rules applicable to the transfer of personal property, for present purposes plaintiffs' contention will be assumed to be the law of the case, viz.: This case is governed by the principle that, where an assault on a record title is made by attempting to establish a title in a third person by secondary proof of a lost muniment of title, a high degree of proof is required. Such evidence must be strong and satisfactory. The benefit of the doubt and the strong presumption is to be given to the record title.

5. The soldiers' homestead scrip of Rogers was personal property and assignable. In Webster v. Luther, 163 U. S. 331, 16 Sup. Ct. 963, 41 L. Ed. 179, approving 50 Minn. 77, 52 N. W. 271, Mr. Justice Harlan said: "Much stress is placed by the plaintiff in error upon the practice of the land department during a certain period, based upon the idea that the right of entry given by the statute of additional lands was entirely personal, and not assignable or transferable. We cannot give to this practice in the land office the effect claimed for it by the plaintiff in error. The practical construction given to an act of

congress, fairly susceptible of different constructions, by one of the executive departments of the government, is always entitled to the highest respect, and in doubtful cases should be followed by the courts, especially when important interests have grown up under the practice adopted. Bate Refrigerating Co. v. Sulzberger, 157 U. S. 1, 34; United States v. Healey, 160 U. S. 136, 141. But this court has often said that it will not permit the practice of an executive department to defeat the obvious purpose of a statute. In the present case it is our duty to adjudge that the right given by the statute in question to enter 'additional' lands was assignable and transferable." In Pardoe v. Merritt, 75 Minn. 12, 77 N. W. 552, Chief Justice Start said: "Such right of entry is not only personal property, but it may be sold and assigned in the same manner as any other personal property, without complying with the law as to the conveyance of real estate. Webster v. Luther, 50 Minn. 77, 52 N. W. 271; Tuman v. Pillsbury, 60 Minn. 520, 63 N. W. 104; Mullen v. Wine [26 Fed. 206]; Webster v. Luther, 163 U. S. 331, 16 Sup. Ct. 963. The case last cited affirms the decision of this court in the same case, and cites with approval the case of Mullen v. Wine." Respondents have collected a score or more of other decisions to the same effect, whose citation here would serve no useful purpose.

The controversy whether defendants bore this burden of proof of showing a valid transfer of title to General Baker turns upon the proof offered to show the existence and contents of the powers of attorney from Rogers to Gilmore and from Gilmore to Baker. Before reviewing the actual testimony, it will clarify to consider four principles of evidence applicable.

One of these principles is that the act of officials of the land department in allowing a location under soldiers' scrip, in delivering a final receipt, and in issuing a patent to land under federal land laws, is evidence that all necessary preliminary steps thereto had been duly taken. The decision of the land department in a contest case is conclusive in the courts upon all questions of fact. Gertgens v. O'Connor, 191 U. S. 237, 24 Sup. Ct. 94, 48 L. Ed. 163. As against collateral attack, also, the patent is conclusive. It "is in the nature of an official declaration by that branch of the government to which the alienation of public lands, under the law, is intrusted, that all the re-

quirements preliminary to its issue have been complied with." Field, J., in Smelting Co. v. Kemp, 104 U. S. 640, 26 L. Ed. 875. And see Beley v. Naphtaly, 169 U. S. 353, 18 Sup. Ct. 354, 42 L. Ed. 775; Sanford v. Sanford, 139 U. S. 642, 646, 11 Sup. Ct. 666, 35 L. Ed. 290. It was held in Bouldin v. Massie's Heirs, 7 Wheat. 122, 5 L. Ed. 414, that the loss of a paper must be established before its contents can be proven, and that, where a patent issues upon an assignment of a military warrant, the legal title is thus consummated, and the assignment itself, being no longer a paper essential to that title, the same degree of its proof cannot be required as if it were relied on as the basis, and that a patent issued is prima facie evidence that every prerequisite of the law is complied with. In Carpenter v. Rannels, 19 Wall. 138, 146, 22 L. Ed. 77, Mr. Justice Swayne said of a case similar to, but not identical with, the one at bar, and involving a presumption similar to that here invoked by defendant (as will subsequently appear): "An act done by a public officer which presupposes another act is presumptive proof of the latter."

The second principle of evidence concerns the method of proving the existence and contents of a lost instrument. The conventional "legal method, or old and beaten track," is proof by a counterpart; or, if there be no counterpart, by an examined copy; or, if there should not be an examined copy, then by parol evidence of the contents. Tayloe v. Riggs, 1 Pet. 591, 7 L. Ed. 275. This is not, however, a necessarily exclusive method. In Davies v. Pettit, 11 Ark. 349, 352, Scott, J., said: "It is known that, not only the existence and loss, but also the contents of lost bonds, bills, notes and other memorials of contracts and various other written instruments of evidence from time immemorial have been allowed to be proven by parol evidence." The oracles of the common law "have ever claimed for it a capacity to afford a remedy for every wrong." "We think that its recuperative energies are fully equal to the work of setting up, by the legitimate operation of its harmonious rules, every landmark of truth and right that may be at any time prostrated, either by the hand of crime, the inevitable accidents incident to men or by the onward wear of time." Such has been the rule accepted by the courts. 2 Wigmore, Ev. § 1267. Thus, in Posten v. Rassette, 5 Cal. 467, 469, Heydenfeldt, J., said: "The proof was sufficient to establish the existence, loss, and

contents of the power of attorney, prima facie. In the case of a lost instrument, where no copy has been preserved, it is not to be expected that witnesses can recite its contents, word for word; it is sufficient if intelligent witnesses who had read the paper understood its object, and can state it with precision. Here, two witnesses, both of whom had been accustomed to draw papers of like kind, and one of whom was a notary public, testify to the contents of the power of attorney by stating clearly and precisely its object. I have no doubt of the competency of this evidence, and there was no error in admitting it." To ignore the effect of passage of time on evidence producible, and to insist upon the standard applicable to recent transactions, would be to "require an impossibility." "Lex neminem cogit impossibilia." In Hargett and Wife v. ———, 3 N. C. 77, the court reached an opposite conclusion. In this, however, it was overruled in a note by Judge Haywood, then reporter. His anomalous action was, however, approved and followed in Mobley v. Watts, 98 N. C. 284, 288, 3 S. E. 677, without a disclosed appreciation of the humor of the situation. The insistence, for example, upon oral proof by recollection testimony only as to one of many similar transactions many years after their occurrence, and the refusal to admit proof of circumstantial and inferential facts, would be to establish a new statute of limitations on substantive rights as varying as human memory and as uncertain as human conscience. The effect would be to require the least reliable testimony. The same reasoning which permits ancient documents, shown to be probably genuine, to prove themselves (see, for example, Everley v. Stoner, 2 Yeates [Pa.] 122) justifies the admission of evidence concerning old transactions generally and concerning the existence and contents of old and lost originals by the best proof practically obtainable, and to leave the weight of such testimony to be determined by the triers of fact. See 2 Wigmore, Ev. §§ 1267, 1268.

The third principle of evidence is that proof of business habit or custom is properly received in corroboration of the defective memory of a witness with respect to a missing instrument. There can be no doubt of the probative value of such evidence. 1 Wigmore, Ev. §§ 92, 94, 96. In Shove v. Wiley, 35 Mass. 558, 561, Shaw, C. J., said, in admitting such evidence in proof of notice of nonpayment of a promissory note to an indorser: "Where bank messengers, notaries

and such official persons do hundreds and thousands of such acts every year, it would be contrary to all human experience to believe that they could recall the recollection of each by force of present memory, even after looking at a written memorandum; but the witness may testify to other facts, which, with the aid of the memorandum, will afford a very satisfactory inference that the act was done; such as his usual practice and habit, his caution never to make such memoranda unless the acts were done, and his consciousness of the importance and necessity of accuracy in this particular." Further, as to the fact of giving notice of protest and contents of such notice, see Miller v. Hackley, 5 Johns. 375, 4 Am. Dec. 372; Union Bank v. Stone, 50 Me. 595, 79 Am. Dec. 631; Nicholls v. Webb, 8 Wheat. 326, 5 L. Ed. 628; as to notice by an insurance company, see Eureka v. Robinson, 56 Pa. St. 264, 94 Am. Dec. 65; as to notice of sheriff's sale, Den v. Downam, 13 N. J. L. 142. And see Walker v. Barron, 6 Minn. 353 (508, 512); State v. Manchester, 52 N. H. 528, 532; Mathias v. O'Neill, 94 Mo. 527, 6 S. W. 253; Gate City v. Post, 55 Neb. 742, 76 N. W. 471; Morrow v. Ostrander, 13 Hun, 219; Beakes v. Da Cunha, 126 N. Y. 293, 27 N. E. 251; 20 Cent. Dig. "Evidence," § 415, "Custom or Course of Business."

The fourth principle of evidence is that pursuant to the policy of the law "in choosing probabilities it is wise to take the best that offers," and consistently with the recognition of the cogency of proof of habit and custom in case of lost or destroyed instruments, the common law recognizes proof of use of a definite and conventional form as sufficiently full. In Perry v. Burton, 111 Ill. 138, 140, Scholfield, C. J., said: "A witness testifying to the contents of a lost deed is not to be expected to be able to repeat it verbatim from memory. Indeed, if he were to do so, that circumstance would, in itself, be so suspicious as to call for explanation. All that parties, in such cases, can be expected to remember, is, that they made a deed, to whom, and about what time, for what consideration, whether warranty or quitclaim, and for what property. To require more would, in most instances, practically amount to an exclusion of oral evidence in the case of a lost or destroyed deed." To the same effect see Crain v. Huntington, 81 Tex. 614, 17 S. W. 242, McCreary v. Reliance, 16 Tex. Civ. App. 45, 41 S. W. 485, Kenniff v. Caulfield, 140 Cal. 34, 73 Pac. 803; Snyder v. Wertz, 5 Whart. 162, Shove v. Wiley, 35 Mass. 558, 564. And

see Bradley, J., in Miller v. Texas & P. Ry. Co., 132 U. S. 662, 10 Sup. Ct. 206, 214, 33 L. Ed. 487. This indeed is intimated, in one of the cases on which plaintiffs largely rely and which they repeatedly cite, viz.: Stocking v. St. Paul Trust Co., 39 Minn. 410, at page 412, 40 N. W. 365, at page 366.

The authorities, in addition to the one just quoted, to which plaintiffs refer us, are not inconsistent with these views. Minneapolis Times Co. v. Nimocks, 53 Minn. 384, 55 N. W. 546, recognized the American doctrine that a copy of a document is better evidence than the recollection of witness as to its contents, and the court excluded the evidence of the secretary of a corporation as to the contents of a notice of a call of which he had no copy. Although the notices were dictated by him to a typewriter from a general form furnished by counsel, he could not say that he had accurately followed the form, which had blanks to be filled up in the notices to be sent out. It was held that a copy of the general form would not have been admissible because it was not a copy of the notice. The distinction between that and the case at bar is obvious. So in Philbrook v. Smith, 40 Minn. 100, 41 N. W. 545, it was held that presumptions of official duty cannot be used to supply the essential facts in the derivation of title, though they may aid in supplying the evidence; and, where the essentials are proved, collateral circumstances will be presumed in favor of right. Here no certificate to the state (tax sale 1874) was delivered to the plaintiff when he took the assignment. He had never seen any. The auditor thought it was the practice to issue both certificates at the same time, but he was unable to say that the practice was uniform. In U. S. v. Ross, 92 U. S. 281, 23 L. Ed. 707, involving claim under the captured or abandoned property act, it was held that "presumption that public officers have done their duty does not supply proof of independent and substantive facts." As restricted to the particular facts of that case, this principle was sound enough; but it clearly is not to be accepted as of universal application. All other authorities cited by plaintiffs in this connection are more readily distinguishable.

6. Under these principles of evidence, was the defendants' proof of the outstanding title sufficient? The plaintiffs insist that no one of seven specific and essential facts necessary to support the judgment has been sufficiently proved: (1) The sale of the soldiers' claim in

the name of any James M. Rogers by competent or by sufficient proof. (2) The original existence of any written instrument, executed in the name of any James M. Rogers, purporting to sell and transfer and absolutely assign any such right. (3) The connection of plaintiffs' father with any such transaction or transactions. (4) The execution by plaintiffs' father of the necessary papers to effect a sale to Freed or Gilmore. (5) A sale by Gilmore to Baker of any set of papers purporting to be in the name of any James M. Rogers. (6) The execution by Gilmore to Baker of a sufficient power of substitution whereby Baker became a soldiers' substituted agent to locate the land. (7) Any location of the land in controversy in Baker's interest. "Proof of no one of these vital and independent facts except No. 4," says plaintiffs' brief of a similar enumeration, "is a substitute or inference for other independent facts or any of them." After a detailed examination of the record, and disregarding this admission of plaintiffs, we are satisfied that the holding of the trial court on these points should not be set aside for lack of evidence.

As to the location by General Baker, there is his unimpeached evidence as to the selection of the lands on the plats in the Duluth land office and as to the sending of Snow to make the actual location in Duluth, and the testimony of Thompson as to the location by Snow, whom he knew, and as to the absence of location by any soldier appearing in person, corroborated, as it was, in many significant details, by Baker's testimony. Baker's testimony as to delivery to him of the final receipt No. 758 to this land, with other receipts, is corroborated by Heaton and by the letter Heaton wrote acknowledging the receipt of them from Baker (Exhibit 44). Plaintiffs' objection to this exhibit, viz., that it was incompetent, irrelevant, and immaterial, was too vague and general to avail the plaintiffs. Moreover, the instrument was admissible, not only on account of its great age, but as a natural and logical corroboration of Baker's testimony on a controverted point of fact. With respect to this and other objections of like character presented by the record, it is to be borne in mind that the question of the competency of a witness and whether proper foundation was laid for the admission of documentary evidence was largely within the discretion of the trial court, and that its decision thereon will not be reversed where there is any evidence tending to show competency, and suffi-

cient foundation, unless the decision is manifestly against the weight of evidence. See Start, C. J., in Meyers v. McAllister, 94 Minn. 510, collecting cases at page 512, 103 N. W. 564, at page 565. Cf. Perkins v. Stickney, 132 Mass. 217. There was proof, accordingly, first, that General Baker located the land in question and the land officer filled in the description accordingly in Rogers' blank application and issued and delivered to Baker the final receipts; second, that the land officer passed upon General Baker's right to locate and to have delivered to him the final receipt; third, that Baker had, and produced to that officer, the regular and required set of papers, which were sufficient. Under the rules of law previously stated, this official act of issuing the final receipts and the subsequent issuance of the patents on the location thus made presupposes that these necessary preliminary papers had been produced and were sufficient in law.

Apart, however, from the conclusion of ownership by inference as conclusive as this, there was direct proof to that effect. Freed's testimony as to the power of attorney from Rogers to Gilmore and Baker's as to the power of substitution from Gilmore to him, and Thompson's as to both such powers, to an undetermined extent are based on recollection. Examination of the evidence of these witnesses, including their cross-examination, has served to convince us that little weight is to be attached to this testimony, regarded as arising upon recollection alone, except, perhaps, Baker's recollection as to the appearance of Gilmore's name in large letters on the power to him. The fact of the sale to Gilmore was proved by documentary evidence—the entry on the statement of account between Gilmore and Freed. Plaintiffs' objection to its admission (that it was incompetent, irrelevant, and immaterial) was too vague and general. It was, moreover, properly admissible in evidence. Its custody was not absolutely, but was sufficiently, shown. Cf. 1 Enc. Ev. 864, 865. Its age, its history, its indorsement in Gilmore's writing, its reference to the receiver of the firm of which Gilmore had been a member, and the possession by Freed of a similar memorandum, was adequate identification. A mere statement of account, it was not necessary that it should have been made at the immediate time of the transaction. Its purpose was not to charge Freed. Its correctness as to the balance against him, for present purposes, is wholly immaterial. In view of the presumption

from the identity of the name upon which the case of both the plaintiffs themselves must in large measure rest, the Rogers referred to was the ancestor of plaintiffs. And see Meyers v. McAllister, supra. That Gilmore sold this scrip to Baker was shown by Baker's positive and unimpeached testimony to that effect. In this he was strongly corroborated by circumstances previously detailed. Both the existence and the contents of the powers are shown by the proof of the custom of business. The dealings in scrip between Freed and Gilmore were extensive. It was the invariable custom between them, and generally, to require a full set of papers, including an adequate power of attorney. Such power of attorney was a business necessity. Unless it was adequate, the scrip was worthless. Baker, Snow, his expert, "under his eye," and Thompson, at the land office are shown to have accepted the proof of the power. The credit Gilmore gave Freed for it shows practical approval of it. The power of substitution passed the inspection and met the approval of Baker, Snow, and Thompson. Finally, the testimony shows that these powers were in forms universally in use in course of such transactions. This was not proof by copy, as defendants urge. It was not at all an examined counterpart. None the less it was, under the principle previously considered, cogent evidence. Other evidence, part of which was documentary, as the "Willis jacket"—that is, the envelope containing the Willis entry—tended to confirm the conclusions of the trial court. It is unnecessary here to detail that corroboration.

Plaintiffs have discussed at length a "list of facts" (some fifteen in number) established, from which inferences opposing those of defendants are drawn, and which tended to disprove the existence of the powers of attorney and their completed execution by any person. These facts are chiefly addressed to matters which were for the trial court alone. Principally, for example, there was Baker's unexplained inattention to his alleged interest, and his neglect and his failure to do what the owner of a tract of land in a timber and mining country would have been likely to do. On the other hand, the defendants urge the similar inattention of the plaintiffs and of their ancestor. The patent remained in the Duluth office; and, while Baker is shown to have manifested an early interest, the plaintiffs completely abandoned all rights under the application. We have

no immediate concern with the doctrine of laches. The inferences to be drawn from the testimony were for the trial court. So at another place the plaintiffs argue that there were six men bearing the name of James Rogers in Johnson county, Arkansas, at the time of the alleged sale to Gilmore. The trial court found, and we think it was justified in finding, although the proof was, as he said, "exceedingly meager and unsatisfactory," that the father of the plaintiffs made the application and affidavit here involved for the additional one hundred twenty acres in Duluth, the subject of this controversy. In addition to Freed's testimony as to the identity of the individual who made this application and signed the power of attorney, and the presumption from identity of names, the land office has passed on the question. Moreover, plaintiffs themselves claim by virtue of Baker's location and the elimination of questions because of the running of the federal statute of limitations upon attack on the patent.

Plaintiffs also urge that they "affirmatively proved by testimony uncontradicted in the record that the signatures affixed to the application and affidavit were not the signatures of their father, and that they were therefore forgeries of his signature." At one time, however, they themselves claimed that the application and affidavit were made by their ancestor. Later in the trial (it would appear by some five weeks) they introduced a deed as a standard for comparison to show that the applications and affidavits sworn to before Mr. Freed were forgeries. We have examined the signatures of the various instruments, and find nothing which would justify us in setting aside the finding in effect of the trial court against the plaintiffs on this point. The action of the land office, moreover, would appear to have made this conclusion necessary. We are at a loss, also, to see how plaintiffs could prevail on this theory. After careful examination of all the considerations urged by plaintiffs, we have concluded that the findings of fact by the trial court are sustained by evidence within the familiar rule on that subject.

7. The powers thus shown to have existed were sufficient to vest title in fee in General Baker. The effect on Baker's rights of the facts as to the fraudulent entry by Rogers on what was conveyed to Baker will subsequently be considered. For present purposes it will

be assumed that the questions in that connection have been resolved in Baker's favor.

(a) Those powers were beneficial and irrevocable. They did not terminate with the death of the grantor (Rogers) in 1896. G. S. 1878, c. 44, §§ 2, 7, 11, 13, 16; Webster v. Luther, 50 Minn. 77, 52 N. W. 271; Id., 163 U. S. 331, 333, 16 Sup. Ct. 963, 41 L. Ed. 179; Pardoe v. Merritt, 75 Minn. 12, 77 N. W. 552; Gilbert v. McDonald, 94 Minn. 289, 102 N. W. 712, 110 Am. St. 368. Cf. Ness v. Davidson, 45 Minn. 424, 48 N. W. 10.

(b) Those powers were adequate in terms and forms to convey to Baker the interest of Rogers in the premises here in issue, in existence at the time of their execution or thereafter acquired by him as an additional homestead. Snell v. Weyerhauser, 71 Minn. 57, 73 N. W. 633. By their terms these powers were irrevocable, sufficient, and contained the usual clause as to further assurances, and were without controversy adequate in this respect. See Ashton v. Great Northern Ry. Co., 78 Minn. 201, 80 N. W. 963. The form was valid. That blank spaces for the subsequent insertion of the description of the land on location (Pardoe v. Merritt, 75 Minn. 12, 77 N. W. 552; Gilbert v. McDonald, 94 Minn. 289, 102 N. W. 712, 110 Am. St. 368), or that the name of the grantee was left blank, "much the same as blank assignments of corporation stock which pass from hand to hand perhaps a dozen times before they are filled up with the name of the assignee" (Bradley, J., in Miller v. Texas & Pacific Ry. Co., 132 U. S. 662, 10 Sup. Ct. 206, 33 L. Ed. 487), did not affect the validity or the sufficiency of the powers. And see Felix v. Patrick, 145 U. S. 317, 12 Sup. Ct. 862, 36 L. Ed. 719.

(c) After the location and before the issuance of the patent, the assignees under the powers, who located the land (Baker), had a substantial and vested property. Red River & Lake of Woods R. Co. v. Sture, 32 Minn. 95, 98, 20 N. W. 229; Nicholson v. Congdon, 95 Minn. 188, 103 N. W. 1034 (in which it is to be noted that the defendant, claiming under the law, through a power of attorney, prevailed). Such rights as Baker had are often referred to as inchoate and inceptive; but "the principle has a wider scope." Sturr v. Beck, 133 U. S. 541, 549, 10 Sup. Ct. 350, 33 L. Ed. 761. And see Dealy v. U. S., 152 U. S. 539, 14 Sup. Ct. 680, 38 L. Ed. 545. The contract

of purchase was complete. The government agreed to make a proper conveyance as soon as it could, and in the meantime held the legal title for the assignee under the power. Witherspoon v. Duncan, 4 Wall. 210, 220, 18 L. Ed. 339; U. S. v. Freyberg (C. C.) 32 Fed. 195, collecting cases at page 197. The land was, therefore, subject to state taxation. Witherspoon v. Duncan, supra; Tidd v. Rines, 26 Minn. 201, 2 N. W. 497. The locator had such title as would have enabled him to have sued third persons for trespass. Peyton v. Desmond, 129 Fed. 1, 63 C. C. A. 651; Hastay v. Bonness, 84 Minn. 120, 86 N. W. 896; Musser v. McRae, 44 Minn. 344, 46 N. W. 673; Webster v. Luther, 163 U. S. 331, 16 Sup. Ct. 963, 41 L. Ed. 179. He could have transferred his title to the land (Shepley v. Cowan, 91 U. S. 330, 23 L. Ed. 424; Smith v. Ewing [C. C.] 23 Fed. 744; Hayward v. Ormsbee, 11 Wis. 3), and have lost it by sale on execution (Kingman v. Holthaus [C. C.] 59 Fed. 315, reviewing authorities; Levi v. Thompson, 4 How. 17, 11 L. Ed. 856), or on his death have transmitted it to his heirs and devisees (Santana Live-Stock & Land Co. v. Pendleton, 81 Fed. 784, 26 C. C. A. 608).

(d) Upon the execution of the patent to Rogers, the beneficial title passed to Baker. That the patent issued to the original applicant (Rogers), not to the owner under the powers of attorney (Baker), because of the practice of the land department in refusing to recognize the assignments of the right of entry, which has been held by the supreme court of the United States to have been founded on an erroneous conception of the law, did not prevent the "vesting in the assignee [Baker] the full beneficial ownership and legal title to the land located." Webster v. Luther, 50 Minn. 77, 52 N. W. 271, affirmed 163 U. S. 331, 16 Sup. Ct. 963, 41 L. Ed. 179; Roy v. Duluth & Iron Range R. Co., 69 Minn. 547, 72 N. W. 794, approved Duluth & Iron Range R. Co. v. Roy, 173 U. S. 587, 19 Sup. Ct. 549, 43 L. Ed. 820; Hastay v. Bonness, 84 Minn. 120, 124, 86 N. W. 896; Gilbert v. McDonald, 94 Minn. 289, 102 N. W. 712, 110 Am. St. 368; Hayes v. Carroll, 74 Minn. 134, 76 N. W. 1017; French v. Spencer, 21 How. 228, 16 L. Ed. 97; Sanford v. Sanford, 139 U. S. 642, 11 Sup. Ct. 666, 35 L. Ed. 290; Stark v. Starrs, 6 Wall. 418, 18 L. Ed. 925; Sturr v. Beck, 133 U. S. 541, 10 Sup. Ct. 350, 33 L. Ed. 761; Landes v. Brant, 10 How. 348, 13 L. Ed. 449. Other au-

thorities previously cited in this connection accord. Scores of other decisions to the same effect have been collected and many of them. analyzed in defendants' brief. This, as will appear from an examination. of the decisions of this court referred to, a number of which have received the sanction of the supreme court of the United States, is. the settled rule in this state. No statutory provision is inconsistent. Rogers was trustee of a mere naked trust. "Under the statute of uses and trusts (chapter 43, G. S. 1878) a conveyance of land from one person to another to the use of or in trust for a third, the trustee having no active duty to perform, constitutes a passive trust, and the trustee takes no title, but the same vests immediately and absolutely in the beneficiary· to the extent of the estate granted." Thompson v. Conant, 52 Minn. 208, 53 N. W. 1145.

The statute abolishing resulting trusts does not apply to this case. The mistaken action and erroneous construction of the federal statute by the land office, and not the voluntary act of General Baker, put the title in Rogers' name without his consent. No relation of agency subsisted. The powers of attorney were valid and operative. The interest of Rogers was assignable. These and other considerations serve to differentiate the cases to which plaintiffs have called our attention. This. vesting of the patent title in the assignee, where the patent is issued in the name of the entryman who has transferred his right by power of attorney, is sometimes worked out through the equitable doctrine of relation. "There is no rule better founded in law, reason, and convenience than this: that all the several parts and ceremonies necessary to complete a conveyance shall be taken together as one act and operate from the substantial part by relation." 5 Cruise, Real Prop. p. 510, approved in Landes v. Brant, 10 How. 348, 372, 13 L. Ed. 449, and in Musser v. McRae, 44 Minn. 343, 347, 46 N. W. 673. And see 24 Am. & Eng. Enc. (2d Ed.) 275; Peyton v. Desmond, 129 Fed. 1, 11, 63 C. C. A. 651 (in which the best review of the authorities on relation will be found made by Van Devanter, J.). The same result is sometimes worked out on the usual theory of estoppel by deed. 16 Cyc. 696, note 53. "The estoppel works upon the estate, and binds an after-acquired title; as between parties." Catron, J., in French v. Spencer, 21 How. 228, 16 L. Ed. 97. "The relief given in this class of cases does not proceed-upon the ground of an-

nulling· or setting aside the patent wrongfully issued, \* \* \* on the theory that the title which has passed from the United States to the defendant, enured in equity to the benefit of plaintiff [the assignee], and a court of chancery gives effect to this equity, according to its forms, in several ways." Miller, J., in Silver v. Ladd, 7 Wall. 219, 228, 19 L. Ed. 138. The result is that under such circumstances the title enured to Baker, and Rogers had no right, legal or equitable, to the premises. Carpenter v. Rannels, 19 Wall. 138, 139, 22 L. Ed. 77. The title has been regarded as passing through Rogers to Baker "without stop." Henderson v. Hackney, 23 Ga. 383, 391, 68 Am. Dec. 529. And see Thursby v. Myers, 57 Ga. 155, 158, 159.

8. That "the doctrine of relation is a fiction of law adopted by the courts solely for the purposes of justice, and \* \* \* only applied for the security and protection of persons who stand in some privity with the party that initiated the proceedings \* \* \* and acquired the equitable claim or right to the title" (Gibson v. Chouteau, 13 Wall. 92, 20 L. Ed. 534), is not a sufficient reason why defendants should not prevail in this proceeding. The trial court held, and defendants' counsel urge, that the doctrine of relation had no place in this controversy. One of plaintiffs' objections to the application to this case of authorities which have just been referred to is that "relation can have no effect to defeat rights of innocent third persons not privies." Conversely, "third parties, strangers and not privies, are not entitled to claim the benefit of the doctrine" of relation. The argument is that all the authorities on which the defendants rely and to which reference has here been made invoke that principle and involve derivative titles in which the party invoking that equitable principle was in privity with the entryman to whom the patent was issued. In support of this contention plaintiffs have called our attention to many cases, the summary of which, slightly modified and annotated by us, is as follows: "Not a state (State v. Itasca Lumber Co., 100 Minn. 355, 111 N. W. 276), nor any county (Reynolds v. County of Plymouth, 55 Iowa, 90, 7 N. W. 468), nor any person, claiming under tax proceedings (Calder v. Keegan, 30 Wis. 126; Durham v. Hussman, 88 Iowa, 29, 55 N. W. 11; Hussman v. Durham, 165 U. S. 144, 17 Sup. Ct. 253, 41 L. Ed. 644), nor a trespasser (Menvil's Case, 13 Coke, 19), nor a disseisor (Butler's Case, 3 Coke, 29)

holding by adverse possession, nor any one not holding by contract with the entryman, no stranger to his rights, can ever be heard in court to allege that legal title flowing from a subsequent patent relates back to cure an incipient right and to make it a legal title, where the purpose and effect of such claim is to prevent recovery by a plaintiff holding under the patent title."

We find ourselves unable to agree on this point with the trial court, defendants' counsel, or with plaintiffs. Whether the proposition just quoted is sustained or not by the authorities referred to and others cited by the plaintiffs depends entirely upon the construction of "who is a plaintiff holding under a patent title." If this means the patentee only, the resulting rule is not the law. If this means a person entitled to the land under the patent, who may be the patentee or the equitable owner under a power of attorney or other form of transfer, the proposition is sound. The real gist of this and similar authorities is that no party not in privity can invoke the doctrine of relation, when the purpose and effect is to vest title in a stranger to the patent title. Thus, in the leading case of Gibson v. Chouteau, supra, the court refused to invoke the fiction of relation on behalf of one who, claiming title by prescription, sought to have the title of the entryman accrue, not when the patent issued, but at the time of entry, so that the adverse possession would have run against the record title for the period prescribed by state statute. The result would have been to divest the patent title and invest a stranger to it with title to the land by prescription. A stranger to the patent title, it was held, could not invoke the doctrine of relation to thus create a link in the chain of his own adverse title. In the instant case, it is assumed, defendants rely only on adverse possession under the statute. They do not invoke the doctrine of relation to make good a lack of their own title, but to show it outstanding in a third person in privity with plaintiffs' ancestor. So in the tax cases referred to courts refused to apply the doctrine of relation, so as to vest title in the patentee at the time of entry and thereby validate proceedings to collect taxes levied on land, title to which had stood in the government. This rule is entirely consistent with the application of that doctrine, so as to confirm title in the owner of the right matured by patent. So to do is in aid of the patent title; to refuse so to do would be to restrict unfairly the initial right of alienation of the

party making the entry. Equally compatible with this view is McCune v. Essig (C. C.) 118 Fed. 273. The main proposition there involved was more fully stated in Hayes v. Carroll, 74 Minn. 134, 76 N. W. 1017, viz.: If on making a final proof the right of one who had made a homestead entry becomes vested with the legal ownership, and if thereafter he died before patent be issued, the land descends to his heirs and devisees. If, however, he die before making the final proof, the widow, under the provisions of the homestead law, is deemed to have a superior equity, and upon making the proof is entitled to the patent. In Stahl v. Lynn, 86 Wis. 75, 56 N. W. 188, the question was between one who had cut and removed timber without legal right and the person having the legal title at the time of the trespass. No question of title between one in adverse possession under a claim of title and a claimant under a patent from the United States was involved. It is accordingly unnecessary to consider whether that decision did or did not imply a proper understanding of Gibson v. Chouteau, supra. It would serve no useful purpose to prolong this discussion by showing that none of the authorities cited by plaintiffs, all of which have been examined, sustain their position.

In brief, defendants do not invoke the doctrine of relation to enforce estoppel to show title in themselves, but in Baker; not to avoid the patent title, but to confirm it. The patent ran to Rogers and his assignors. In furtherance of it title vested in Baker. See Massey v. Papin, 24 How. 362, 16 L. Ed. 734. Not the privity of defendants with Rogers, but the privity between Rogers and Gilmore, is the controlling circumstance. Defendants, in the view here taken, rest on adverse possession under claim of title, and not as a "chronological successor of the entryman," and do not seek to strengthen their own title by means of relation or estoppel, but to prove the outstanding title. This, as has been seen, they have the right to do under rules of evidence and by the application of appropriate legal or equitable principles. The trial court in this connection has aptly said: "All persons connected with this case desire that patent given effect according to its terms. * * * At the date of such issue and record General Baker was in possession of an instrument affecting the title to such land, which was in common use in such cases —the power already referred to. It had a double office. In the first

104 M.—15

place, it authorized the entry of the land in the name of the donor of the power. As to that its office had been performed. Secondly, the instrument as an entirety, given its full breadth of meaning, provided that as to the land to be entered and patented the donee of the power should have the entire beneficial interest, might sell it when and to whom and for what price he pleased, and that to him should belong the proceeds of all such sales. * * * At that time the instrument in question, under which General Baker claimed, was, as to this second office and meaning, in full force and effect. It was then a living, speaking, operative instrument. It was not like a quitclaim deed or sheriff's certificate—dealing only with conditions as they existed at a given time in the past. It looked to the future, and had a continuing operative effect. In so far as it affected the title of the land to be acquired, it had fully as much force and meaning as if it had not been executed until that day." See Everest & Strode, Est. (2d Ed.) c. 7.

9. The application of ordinary rules of equitable jurisprudence will not be refused to enable heirs seeking equitable relief to base their title upon perjury and fraud. The plaintiffs in this case will not be permitted to destroy Baker's interest by juggling title into themselves through their father's wrong. They insist that before the patent issued to them there was no equity outstanding, and that the patent validated by the operation of the statute of limitations was in legal effect a mere voluntary conveyance, a gratuity, a gift, by the federal government to their ancestor. In that connection our attention has been called to the obvious rule that relation has ordinarily no application to make a bad deed good, because it conferred no title, legal or equitable, in the grantee. Baker's rights under his location, it is argued, were therefore "ashes, a blank paper in his hands." It would obviously violate the fundamental principles of equity to accept this contention and allow the plaintiffs to profit by their ancestor's spurious entry at the expense of Baker, an innocent purchaser from him for value. The courts will not permit plaintiffs to utilize Baker's location for vesting title in their fraudulent ancestor, and to repudiate it as conferring any interest in Baker himself. "Qui approbat, non reprobat." Kingman v. Holthaus (C. C.) 59 Fed. 305, 314. "Allegans suam turpitudinem non est audiendus." Everest & Strode, Est

(2d Ed.) at page 228, et seq. "No man," said Lord Mansfield in Good-title v. Bailey, Cowp. 597, "shall be allowed to dispute his own solemn deed." That Rogers, the vendor, could not take this position as against his vendee, is obvious. No reason has been suggested why the principle should not be applied to show title not in defendants, who are not in privity with Rogers, but who are seeking to show outstanding title in Baker. Defendants, we reiterate, are not seeking to attack the patent title or defeat those asserting it, but to show its true status in court. Any other course would result in the very evil which equity seeks to avoid. The effect of the running of the statute of limitations was to confirm all proceedings which resulted in a title in Baker.

Plaintiffs' counsel have argued propositions of law and of fact and have urged decisions not herein referred to. Their criticism on and analysis of some of the cases here cited have not been fully adverted to. To all of these matters due consideration has been given. The length of this opinion precludes a fuller discussion. After examination and consideration of the entire arguments of both counsel, we have concluded that the trial court must be affirmed.